## James Farrer v. The State.

| 42 | 265 |
|----|----|
| 29a | 340 |
| 42 | 265 |
| 30a | 137 |
| 42 | 265 |
| 32a | 153 |
| 42 | 265 |
| f33a | 196 |

1. Murder—Express malice. To constitute express malice, the act of killing must not result from a mere sudden, rash, and immediate design, springing from an inconsiderate impulse, passion, or excitement, however unjustifiable or unwarranted it may be ; in such case, the sedate, deliberate mind is wanting, and without it there can be no express malice.

2. EXPRESS MALICE is not imputed as a presumption of law from the un-
explained act of killing ; but to warrant a conviction of murder in the
first degree, it must be proved, like any other fact in the case, by such
evidence as is reasonably sufficient to satisfy the jury of its existence.

APPEAL from De Witt.   Tried below before the Hon. D.
D. Claiborne.

James Farrer was indicted and put on trial for murder.
Allen Brown, witness for the State, testified that " on August
" 25, 1874, in De Witt county, witness and several other Mexi-
" cans and freedmen were on the hill, beyond the residence of
" witness; that a horse-race had been agreed to be run that
" morning between the Mexicans and some of the freedmen, on
" the hill ; the parties being there for that purpose.   One of the
" Mexicans and one of the freedmen were measuring the dis-
" tance ; when they had measured one hundred and thirty yards
" they stopped, and defendant said to the Mexican engaged in
" measuring, ' You d——d son of a bitch, you know that ain't
" ' right,' and seizing the rope, attempted to take it from the
" Mexican, who resisted, but the defendant finally succeeded in
" pulling the rope from the Mexican ; and, doubling the rope,
" struck the Mexican with it.   The Mexican retreating a few yards
" mounted his horse, and made at the defendant, and struck him
" on the head or face with a loaded quirt—which blow stunned
" defendant and caused him to stoop or fall to his knees.   The
" defendant then was joined by several freedmen, the Mexican
" by several Mexicans, and a general fight occurred between the
" freedmen and the Mexicans.   At this point of the fight, witness
" observed Joe Webb dismount from his horse and run to the
" assistance of defendant.   The fight continued some time, the
" Mexicans fighting on horseback with their quirts, the freed-
" men on foot throwing stones—finally, the Mexicans fled ; and
" the witnesss, with a Mexican named Philip Baraldono, and who
" was to have rode one of the horses in the race, rode towards
" that end of the track from which the Mexicans had begun to
" measure the distance to be run, and near that end of the track

"the deceased, Polonio Soto, was sitting on his horse with a "child before him, on same horse. Witness presently saw de-"fendant advancing upon deceased in a hostile manner. Wit-"ness called to defendant, 'Jim, don't you hurt that old man.' "Defendant replied, 'Damn him, I will kill him,' and imme-"diately threw a stone at deceased, and struck him upon the "head, knocking him from his horse to the ground; defendant "then threw another stone at deceased, which also struck him "on the head, and then a third, making three licks in all given "deceased by the defendant. The deceased had taken no part "in the fight between the defendant and the Mexicans, and if he "was present witness did not see him. He was attacked be-"tween one hundred and one hundred and thirty yards from "where the fight between the Mexicans and freedmen had com-"menced. The deceased was knocked senseless, and his brains "knocked out by the defendant; and died about twenty-four "hours after the injury, and died from the effect of the three "blows. The defendant, as he advanced upon the deceased, "staggered, but witness did not know whether defendant was "drunk or not. Witness had seen him drinking with the Mexi-"cans before the fighting commenced; defendant was not so "drunk as not to run off after he had killed the Mexican. De-"fendant had several stones in his bosom when he advanced "upon the deceased. When defendant advanced on deceased "witness called to a son-in-law of deceased to run to his assist-"ance; he and Joe Webb took defendant off the deceased. "Witness then sent to Clinton for the soldiers, some of whom came, * * went in pursuit of defendant and found him. * * "

On cross-examination, witness was asked as to his testimony before the examining court.

Philip Baraldono, for State, testified, that "Allen Brown "called to witness just before deceased was killed, and told "him that the defendant was about to attack deceased. Wit-"ness immediately started towards deceased, but before reach-"ing him, deceased was struck upon the head by a rock thrown "from the hand of the defendant, and knocked from his horse

" to the ground; defendant gave deceased two blows upon the " head after he had been knocked to the ground—all of the " three blows were upon the head; the skull of the deceased " was broken; his brains were not knocked out; all of the " blows were given with stones thrown from the hand of de- " fendant. The deceased was sitting upon his horse holding " a child before him at the time he was attacked by the de- " fendant, and he had taken no part in the fight between the " defendant and the Mexicans. Witness, with the assistance " of a negro man, took defendant off deceased. The deceased " died from the wounds in about twenty-four hours after they " were inflicted. This was in De Witt county, 24th August, " 1874.

" Witness was the son-in-law of deceased; the child deceased " held when he was stricken from his horse was not injured, " the child fell on one side of the horse and the deceased on " the other."

For the defendant, Dick Hopkins, a freedman, testified that " he saw deceased on the day he was killed, with defendant and " others, near the race-ground—deceased was dealing monte, and " defendant was betting. Several negroes and Mexicans were in " the party; some of the boys went to town for whisky and got " a bottle of it, and witness feared there would be a disturbance " among them. Witness was at one end of the race-track when " the fighting commenced between the negroes and Mexicans, " and rode up to where the fighting was going on, and just as he " got up there the Mexicans began to ride off; and witness " asked defendant ' what was the matter.' Defendant replied, " One of these Mexicans has knocked me on the head with a " quirt." Witness then rode after the Mexicans and inquired " of several who struck defendant, but each replied that ' it was " ' not him.'

" * * * Witness did not recognize the deceased among the " Mexicans who were fighting with the defendant and other " freedmen at the time witness inquired of defendant what was " the matter. All the Mexicans that witness saw at that time

" were engaged in the fight   When defendant told witness that
" one of the Mexicans had knocked him in the head with a quirt,
" witness saw the wound upon defendant's face or head, and he
" thought he saw blood upon defendant's face,-but he was not
" certain about it.   Witness said defendant had been drinking,
" and he might have been drunk.   When witness, Allen Brown,
" and others were standing around the deceased, as he lay upon
" the ground, they observed the defendant coming towards them,
" and Brown told witness ' not to let defendant come back to
" ' where the deceased was, but to go and turn him back.'
" Witness then went to prisoner and told him not to go down to
" where deceased was. Defendant said, ' them Mexicans thought
" ' they could whip him (defendant), but he would show them
" ' they could not do it.'   Witness told defendant if he went
" down there, the Mexicans would kill him, but defendant in-
" sisted on going, and threatened to fight witness.   Witness
" then got down from his horse and told defendant if he wanted
" to fight him, *come on*.   Witness finally persuaded defendant to
" turn back.   *   * "

Eli Mike, a freedman, testified that " he went with Dick Hop-
" kins to where the defendant and other freedmen were fighting
" with the Mexicans.   Witness saw defendant throw the stone
" at deceased ; the stone struck and knocked him from his horse
" to the ground ; defendant threw at the deceased twice after
" the deceased had fallen to the ground ; but witness could not
" tell whether the stone struck the deceased or not.   Defendant
" had been drinking, and he might have been drunk.   The de-
" ceased was not in the fight between the freedmen and the
" Mexicans, but was sitting on his horse when attacked by the
" defendant some distance from where the fight took place."

Joe Webb, a freedman, testified that " defendant was struck
" on the head by a Mexican with a loaded quirt, and knocked to
" his knees ; several Mexicans fought the defendant ; there were
" several freedmen in the fight also ; the freedmen ran to the as-
" sistance of the defendant when he was surrounded by the
" Mexicans.   The Mexicans fought on horseback and made use of

"their quirts; the negroes fought on foot and threw stones at
"the Mexicans. Defendant had been drinking. Witness as-
"sisted Baraldono to take defendant off the deceased and carried
"defendant off. Witness did not see the defendant strike the
"deceased when he was knocked from his horse; saw defend-
"ant throw at deceased after he was upon the ground, but don't
"know whether the stones thrown by defendant struck deceased
"or not; the deceased was about thirty yards, when attacked by
"defendant, from where the fight commenced between the
"freedmen and the Mexicans. Witness did not observe the
"child deceased held at the time he was attacked by the de-
"fendant.

"The race was to have been run for the distance of two hundred
"yards. When one hundred and thirty yards had been meas-
"ured with a rope by a Mexican and Robertson, they stopped,
"and the defendant said to the Mexican, 'You d——d son of
"'a bitch, you know that ain't two hundred yards, I don't mean
"'to be cheated out of my money,' and seizing the rope,
"wrenched it from the Mexican, after some resistance on the
"part of the latter, and defendant then struck the Mexican with
"the rope, and the Mexican retreated a few steps, mounted his
"horse, and then assaulted the defendant and gave him a blow
"upon the side of the head which stunned him, and caused him
"to fall upon his knees; the fight then became general between
"the Mexicans and the freedmen."

The court instructed the jury by giving the statutory defi-
nitions of murder, and its degrees—giving the discussion in
McCoy v. The State as defining express malice. No further
definition of murder in the second degree was given, although
the jury was told that they could find defendant guilty of mur-
der in the second degree.

The jury returned a verdict of murder in the first degree,
and judgment accordingly.

*W. L. Davidson* and *H. Clay Pleasants*, for appellant.

*Geo. Clark*, for State.

MOORE, J.   To constitute express malice, killing must result from an act done in pursuance of a formed design of a sedate, deliberate mind to kill the deceased, or to inflict upon him, by an unlawful act, some serious bodily harm, which might probably end in depriving him of life. (McCoy v. The State, 25 Texas, 33.)   From the analysis of this definition, it will be seen that the killing may be with express malice, though there was, in fact, no intention or design to take the life of the deceased.   It is the act by which one doth kill, to which the formed design must refer, and not to the fact of killing.   Nor, on the other hand, does the mere design to kill, without lawful excuse or justification, however fully formed and firmly fixed in the mind, constitute, of itself, express malice.   For the design must originate in, or result from a sedate, deliberate mind.   These words, indicating the state of the mind when the design is formed, are not, however, to be understood in an absolute and unconditional sense, for it would be almost impossible that any one, not altogether devoid of human sensibilities, and reduced to the level of the brute, could deliberately design to take the life of a fellow-being, with an absolutely calm and unruffled mind, without any character of mental excitement whatever. Still they certainly import that the mind is sufficiently composed, calm, and undisturbed to admit of reflection and consideration on the design.   That it is in a condition to comprehend and understand the nature and character of the act designed, and its probable consequences and results.   The act must not result from a mere sudden, rash, and immediate design, springing from an inconsiderate impulse, passion, or excitement, however unjustifiable and unwarranted it may be.   For in such case the sedate, deliberate mind is wanting, and without it there can be no express malice.

To guard against all danger of misconception, we add, we do not intend to be understood—if the design is formed with a sedate, deliberate mind, the fact of such design being executed while the slayer is under the influence of rage, passion, or other character of excitement—the killing may not be attrib-

utable to the preconceived expressed malice. But when the design has its first inception and origin in an inflamed and excited mind, incapable of such sedate, deliberate action as is compatible with express malice, and such design is carried into immediate effect before there has been cooling time for passion, or for the excitement to abate, and the mental equilibrium to be restored, the killing under such circumstances, no matter how such passion or excitement may have been induced or originated, can not be murder in the first degree.

It is a familiar axiom that every one is presumed to understand the probable result of his act. And when an unlawful act is clearly shown to have been done, it is for the defendant to show facts which mitigate, excuse, or justify it, so that a reasonable doubt at least may arise on the entire evidence in the case as to his guilt. Hence, when the killing is proved, and it is not shown to have been done under sudden passion, induced by adequate cause; or under circumstances which excuse or justify it, such killing must be regarded as voluntary and designed, and therefore with the malice which the law imputes to such homicide. And since the mere rage, passion, or mental excitement (unless it has resulted in some character of insanity, to which we need not here advert) does not mitigate, much less excuse a voluntary homicide, however ungovernable one's temper may be, or however great his excitement, if it result from his voluntary, though merely rash and inconsiderate conduct, he must be held to the same accountability for his acts done under such circumstances as those done in his calm and sober moments. It is therefore quite obvious, that the mere fact of being drunk, or mere mental excitement or ungovernable passion and rage, which may be engendered by drinking intoxicating liquors, will not mitigate the criminality of a voluntary killing below the grade of murder.

But while the law implies malice on proof of voluntary homicide, it does not impute express malice. This is an inference not of law, but a question of fact, consisting in intention dependent upon the state of the mind. And to warrant a con-

viction of murder in the first degree, it must be proved like any other fact in the case, by such evidence as is reasonably sufficient to satisfy the jury of its existence.

The evidence by which this inward intent is to be shown consists of external circumstances, such as the acts or declarations of the party, preceding or nearly connected with the killing, manifesting the state and condition of his mind, and the nature and intent of his design. Thus, antecedent menacings, former grudges, deliberate compassings, and the like have always been regarded as facts strongly tending to prove the existence of express malice. But, as has been frequently held by this court, it does not follow, because the killing may be the result of the prompt and speedy execution of a hasty or immediate resolution, that it may not have been done with express malice. The law has no scales to measure the time in which a sedate, deliberate mind may reach a formed design to kill, or do some serious bodily injury, which may probably result in death. When such design is once formed, the haste with which it is put in execution in no way affects or modifies the character of the act, or the degree of guilt thereby incurred.

As the difference in the degrees of murder does not result from the length of time taken to form the design, or the speed with which it is executed, but upon the state and condition of the mind in which the design is formed, it is obvious that it will often be difficult in homicides, without antecedent explanatory facts showing their true character, to determine to which class the particular case under consideration belongs. It is always to be borne in mind, however, whatever difficulty there may be in establishing the fact that the killing was with express malice, still it is incumbent on the State to prove it, before the accused be properly convicted of murder in the first degree. This may be done by proof of the cool, calm and circumspect deportment and bearing of the party when the act is done, and immediately preceding and subsequent thereto ; his apparent freedom from passion or excitement; the absence of any obvious or known cause to disturb his mind, or arouse his

18

passions; the nature and character of the act done; the instrument used, as well as the manner in which the murder is committed; declarations indicating not only his state of mind, but also the purpose and intent with which he acts, and the motives by which he is actuated; and all such other matters and things pertinent to the issue which may be suggested by the facts of the case.

But if, on the other hand, there is nothing in the conduct and declarations of the party killing, or the attendant circumstances connected therewith, from which a sedate, deliberate mind is to be inferred when the design was formed to do the act from which death ensued, obviously the State will have failed to make out a case of murder in the first degree. And though, in the absence of explanatory circumstances, it might be inferred that the killing was done with express malice, if it is clearly shown that, owing to some pre-existing cause, the party killing was wholly incapacitated to form a design with a sedate, deliberate mind when the design to do the act from which death has ensued was formed and executed, whatever may have been the cause from which such want of capacity originated, it is equally clear he can not be guilty of murder in this degree.

Whether the killing was done under the one state of fact or the other, is a question for the jury, and should be submitted to their consideration under instructions presenting the alternative phases presented by the testimony, from which the proper conclusion should be deduced.

An application of these general principles to the charge given in this case by the court to the jury, shows that it may have operated prejudicially to appellant. It presents a very elaborate, and, in the main, correct exposition of the law held applicable to murder in the first degree, as laid down in the former decisions of this court. And, without charging upon the weight of evidence, properly illustrates, with evident reference to the testimony in the case, facts and circumstances tending to prove that the killing was with express malice. But there was an utter failure to present, with equal fullness and

elaboration, the law applicable to murder in the second degree, or to advert to the facts in evidence tending to show the absence of a sedate, deliberate mind ; such, for instance, as the character of the weapons used ; the circumstances under and purpose for which they had been procured ; the almost immediate combat in which the appellant and his friends had been engaged with the friends and associates of the deceased ; the possibility that he was in the pursuit of these parties when he encountered the deceased, and, notwithstanding the warning given him to the contrary, that he may, in his blinded passion, have supposed the decedent to be one of them ; the effect of this combat and the severe blow on the head given appellant but a little while before, are especially calculated to arouse anger and to excite to rash and intemperate acts of violence and strife, and other matters in the statement of facts, to which we need not advert.

It is not proper, as has often been said by this court, for the judge, on the trial of a criminal case, to announce merely the general principles of law defining the offense charged, but he ought also to instruct the jury on the law applicable to the particular case before them, as developed by the facts proved. He should anticipate probable conclusions on the facts, and adapt his instructions to such deductions from them as may be properly made by the jury, which would warrant the defendant's acquittal or conviction. (Marshall v. The State, 40 Texas, 200.)   In this particular the charge of the court is clearly deficient, and the judgment must, on this account, be reversed.

As it is unnecessary for the disposal of the case to pass upon the other questions discussed by counsel, upon some of which it is not certain the opinions of all the members of the court would be in harmony, we refrain from any comments upon them.

The judgment is reversed and the cause remanded.

Reversed and remanded.