## LEE PRIMUS *v.* THE STATE.

1. MURDER IN THE FIRST DEGREE.—To constitute murder in the first degree, the homicide, if not committed by poison, starving, or torture, or in the perpetration, or attempted perpetration, of arson, rape, robbery, or burglary, must be committed with express malice.

2. EXPRESS MALICE.—In a homicide upon express malice, the death results from an act done in pursuance of a formed design of a sedate, deliberate mind, to kill the deceased, or to inflict upon him, by an unlawful act, some serious bodily harm which might probably end in depriving him of life.

3. SAME.—A homicide may be on express malice, and murder in the first degree, though there was no design to take the life of the deceased, provided there was a design to do him such serious bodily harm by an unlawful act.

4. SAME.—But a design to kill or to inflict such bodily harm, though without lawful excuse or justification, and though fully formed and fixed in the mind, does not constitute express malice unless it originate in, or result from, a sedate, deliberate mind.

5. "A SEDATE, DELIBERATE MIND" imports a mental condition sufficiently composed to admit of reflection on the design, and to comprehend the nature and probable consequences of the designed act.

6. SEE THE FACTS of this case for a state of proof under which the act of killing is held not to be referable to a formed design or previous grudge, but to provocation given, or sudden passion engendered, on the immediate occurrence of the conflict.

APPEAL from the District Court of Burnet. Tried below before the Hon. W. A. BLACKBURN.

Mack Peppers, the deceased, was a youth about seventeen years old, when, on December 27, 1876, he was shot and instantly killed by Lee Primus, the appellant, at a crossing of the Colorado river, in the county of Burnet. The appellant is a negro, and it is implied, rather than stated in the evidence, that he and the other persons present were youths or boys, and all mutual acquaintances.

On the day named, the deceased and Milton McArthur were hunting with double-barreled shot-guns, and, on coming to the east bank of the Colorado river, there found the appellant in company with Phillip Spencer, Ed Moore, Abe Allison, and others whose names are not given, some of whom were bailing out a boat. As Peppers and McArthur came up to the other party, Moore and Peppers spoke to each other, and presently Moore pointed to Lee Primus, the appellant, and said to Peppers, "Do you know this fellow? This is the fellow that gave you the d—d lie, and that you made run." Peppers then spoke to the appellant, saying, "Is that you, Lee?" and the latter answered, "Yes." Then Peppers said, "Come up here, then, and I will settle with you for what you have said." The appellant did not go, and made no reply, so far as the evidence shows. Peppers then added, "I will settle with you when we get across the river," and the appellant still made no reply.

Peppers, Moore, and others then took the boat and crossed the river, which was about 100 yards wide, leaving McArthur, Allison, Spencer, and Primus, the appellant, on the east bank. McArthur and Allison went a few steps up the bank to look for some wild geese, and both testified that as they did so they heard Spencer ask Primus if he was afraid of Peppers, and heard Primus answer that he was not; and that Spencer and Primus had some further conversation, which the witnesses did not understand.

The boat was brought back by one of those who had first crossed, and McArthur, Spencer, and Primus got in and

crossed over, Spencer carrying McArthur's gun, and Primus picking up a small stick, described as being two or three feet long, with which he helped push the boat. As the boat approached or struck the west bank, Peppers, standing on the bank, said to Primus, " Come out," or " Hurry out ;" " I want to settle with you for what you have been saying." Primus said nothing, but got out of the boat, and had stepped but a very few feet from it when Peppers pushed or struck him, and Primus struck back with the stick. Thereupon Peppers picked up a smaller stick, and with it struck the appellant, but in doing so broke the stick. Peppers immediately turned, and went a few steps towards where he had laid his gun upon some rocks, exclaiming, " Give me my gun, and I will shoot the d—d rascal." But Spencer had already picked up this gun, also, and said Peppers should not have it. Primus, running around Peppers, went up to Spencer and seized McArthur's gun by the breech, and, getting it away from Spencer, immediately fired both barrels at Peppers, killing him instantly. Primus then struck McArthur with the gun, who was attempting to interpose and prevent Primus from shooting. Spencer and Primus then went away together.

Spencer was not a witness at the trial, and it appears incidentally that he had been killed since the death of Peppers. There was no evidence of any ill-will between him and Peppers, but none of the witnesses observed that he made any struggle to retain the gun when it was seized by Primus.

W. Peppers, twelve years of age, testified for the state, to show a former difficulty between the appellant and the deceased. The substance of his testimony appears in the opinion of this court.

The court below gave to the jury a very full, able, and obviously impartial charge, including the doctrine of reason-

able doubt in all its phases, but not the presumption of innocence otherwise than by implication or inference.

The jury found the accused guilty of murder in the first degree, and judgment of death was entered on the verdict.

A motion for a new trial was made and overruled. The causes assigned in it present the questions revised by this court, and will be found in its opinion.

No brief for the appellant.

*George McCormick,* Assistant Attorney General, for the State. Seriously considering the situation of the unfortunate human being whose life may depend upon the view this court shall take of the appeal, I will urge only such action by the court as I think demanded by the facts and a conscientious discharge of a public duty. A careful examination of the record will show no material error in the proceedings of the court below.

The charge of the court appears to have been a full, fair, and comprehensive instruction upon the law of the case as made by the evidence; giving not only the letter of the law to the jury, but its just and humane spirit also—that spirit of which our jurisprudence so largely partakes, and which endears it so much to the hearts of an enlightened and conscientious people. A motion for a new trial was made in the court below, and it was urged upon two grounds only. The 1st was because the verdict was contrary to law and the evidence; the 2d, because the court failed to charge the presumption of innocence. Neither of these grounds can be sustained. The court sufficiently charged the presumption of innocence and the reasonable doubt. Indeed, so carefully did the court instruct upon the law of doubts, that the rule laid down by this court in *Murray* v. *The State,* 1 Texas Ct. of App. 417, recommending that in cases of murder the doubt be

·charged between each of the degrees of the offense, was fully met. And I submit it was not necessary to do more. Where the court below refused to charge the jury, even after the charge was asked by the defendant, "that the defendant is presumed to be innocent until his guilt is established by legal testimony," our supreme court held that the facts of the case did not warrant the charge; and, its refusal not appearing to have prejudiced the defendant's rights, it was no error to refuse the charge. *Rideus* v. *The State*, 41 Texas, 199, citing *Pilkinton* v. *The State*, 19 Texas 217. And so it may be well said of the case at bar that it was not necessary for the court, after having given so fully the law as applicable to the reasonable doubt, to charge further upon the presumption of innocence. Then the question is, Does the evidence show that the killing was upon express malice?

Mr. Starkie says that express malice consists in an actual and deliberate intention unlawfully to take away the life of another; and that the actual existence of such an intention is a question of fact to be found and ascertained by the jury. 2 Stark. 711.

Hale explains express malice to be a deliberate intention of doing some corporal harm to the person of another. 1 Hale's P. C. 451.

Sir William Blackstone tells us that "express malice is when one, with a sedate, deliberate mind and formed design, doth kill another, which formed design, if evidenced by external circumstances," etc. 4 Bl. 198.

Chief Justice Roberts, of our own supreme court, in the case of *McCoy* v. *The State*, 25 Texas, 37, has clearly, fully, and forcibly explained the law of malice, which case may be considered the leading authority upon the subject in our courts. He says: "For although the killing be upon a sudden difficulty, it may be attended with such circum- stances of enormity, cruelty, deliberate malignity, cool, cal-

culating compassings, or even demeanor and absence of passion, as will be sufficient evidence to establish the inference that the killing was the result of a sedate, deliberate mind and formed design to take life.

" In cases of sudden killing, in the absence of previous ill-feeling, or where it is too slight to be presumed to be the motive for the act, there may often be found ample evidence of express malice in the means used or manner of doing it. For a man is always presumed to intend that which is the necessary, or even probable, consequence of his acts, unless the contrary appears."

I submit that the evidence in this case was sufficient, and did establish express malice in the mind of the defendant, both before the time of the killing and at the time; that former threats, former grudges, and previous ill-feeling were shown; that the course of the confederate of the defendant, Philip Spencer, furnishes also strong evidence of a preconceived determination to kill on the part of the prisoner.

. This case in many of its facts and circumstances is similar to the case of mulatto Bob, reported in 4 Dall. See Whart. on Hom., bottom page 143.

WINKLER, J. The defendant was indicted, tried, and convicted, in the district court of Burnet county, for the murder of Mack Peppers, alleged to have been committed December 27, 1876. He was convicted of murder in the first degree, and the penalty of death was assessed against him. A motion for a new trial was made and overruled, and an appeal taken.

We have not been favored by either a brief or oral argument on behalf of the appellant. The only statement in the record which calls in question the correctness of the conviction arises upon the motion for a new trial, which is based upon the following grounds, as set out in the motion:

" 1st. Because the verdict of guilty of murder in the first degree, as brought in by the jury upon the trial of said cause, is contrary to, and not supported by, the law and the evidence offered in said trial and submitted to the consideration of the jury.

" 2d. Because the court erred in not embodying in the charge that a defendant in a criminal charge is presumed to be innocent until his guilt is established by legal evidence; thereby omitting to charge all the law applicable to the case on trial."

This motion embraces two propositions:

1st. Does the evidence under the law support the conviction of murder in the first degree?

2d. Does omission to charge the legal presumption of innocence constitute an error of sufficient importance to require a reversal of the judgment, taken alone or in connection with any other error apparent in the record?

The most material question for our consideration is, Does the evidence, as set out in the transcript, constitute murder with express malice? There is no pretense that the homicide was committed by poison or starving, or by torture, or in the perpetration, or in the attempt at the perpetration, of either of the crimes of arson, rape, robbery, or burglary. The only other kind of homicide known to the law, which will constitute murder in the first degree, is murder committed with express malice.

The precise meaning of the term *express malice* is not laid down in the Code, yet its legal significance has been well defined and understood since the decision of *McCoy* v. *The State*, 25 Texas, 33, decided in 1860, and followed ever since, but more especially in the case of *Farrer* v. *The State*, 42 Texas, 265. The cases of McCoy and Farrer were both carefully considered, and in both cases it was necessary for the court to decide what the law required to constitute murder of the first degree, and to determine and give effect

to the term *express malice;* and this is the question here to be considered, and applied to the present case.

We quote from the opinion of the court in *Farrer* v. *The State*, as appropriate and to the point:

"To constitute express malice the killing must result from an act done in pursuance of a formed design of a sedate, deliberate mind to kill the deceased, or to inflict upon him by an unlawful act some serious bodily harm, which might probably end in depriving him of life." Citing *McCoy* v. *The State*. From the analysis of this definition it will be seen that the killing may be with express malice, though there was in fact no design to take the life of the deceased. It is the act by which one doth kill to which the formed design must refer, and not the fact of killing. Nor, on the other hand, does the mere design to kill, without lawful excuse or justification, however fully formed and firmly fixed in the mind, constitute, of itself, express malice. For the design must originate in, or result from, a sedate, deliberate mind.

"These words, indicating the state of the mind when the design is formed, are not, however, to be understood in an absolute and unconditional sense; for it would be almost impossible that any one, not altogether devoid of human sensibilities, and reduced to the level of the brute, could deliberately design to take the life of a fellow-being with an absolutely calm and unruffled mind, without any character of mental excitement whatever. Still, they certainly import that the mind is sufficiently composed, calm, and undisturbed to admit of reflection and consideration on the design—that it is in a condition to comprehend and understand the nature and character of the act designed, and its probable consequences and results.

"The act must not result from a mere sudden, rash, and immediate danger, springing from an inconsiderate impulse, passion, or excitement, however unjustifiable and unwar-

ranted it may be.   For, in such a case, the sedate, deliber-ate mind is wanting, and without it there can be no express malice.

"To guard against all danger of misconception, we add we do not intend to be understood—if the design is formed with a sedate, deliberate mind, the fact of such design being executed while the slayer is under the influence of rage, passion, or other character of excitement—the killing may not be attributable to the preconceived express malice.   But when the design has its first inception and origin in an inflamed and excited mind, incapable of such sedate, delib-erate action as is compatible with express malice, and such design is carried into immediate effect before there has been cooling time for passion, or for the excitement to abate, and the mental equilibrium to be restored, the killing, under such circumstances, no matter how such passion or excite-ment may have been induced or originated, cannot be mur-der in the first degree."

Do the facts and circumstances surrounding the case under consideration, preceding, at the time of, and subse-quent to the homicide, as shown by the evidence on the trial, discover that any act done against the person of the deceased, likely to result in death, or bodily injury endan-gering life, was the result of a deliberate design in the mind of the accused, formed after calm reflection and delibera-tion, as the moving cause of the act committed which resulted in the death of the deceased?

If so, upon the authority cited above, the killing was upon express malice, and murder in the first degree, and the judgment, unless otherwise erroneous, must be affirmed. If the circumstances developed by the evidence do not show that the act which resulted in the death was the result of an act done in pursuance of a formed design of a sedate, deliberate mind to kill the deceased, or to inflict upon him by an unlawful act some serious bodily harm,

which might probably end in depriving him of life, the killing was not murder in the first degree, and the judgment must be reversed.

Now, if the killing is to be referred to the occurrence spoken of by the witness, the brother of the deceased, which occurred about a year before the killing, it would be murder on express malice and in the first degree. But giving the testimony of this witness its full force, notwithstanding his youth and the relationship he bore to the deceased, when taken in connection with the other testimony, the evidence becomes very weak and inconclusive upon which to take life.

The meeting of the parties on the day of the final rencounter, so far as the evidence discloses, was purely accidental. There is no evidence that the accused had made any preparation for a hostile meeting, or that he anticipated anything of the kind. Not only the accused, but the persons with whom he was in company, were all unarmed, and, according to the testimony of the witness Allison, even the stick carried across the river by the accused was picked up by him in the boat when he started over the river, and this not until after the two parties had met, and after the deceased had crossed the river, whilst the deceased and the one in company with him each had a double-barreled shot-gun. When the parties first met on the bank of the river, it was the deceased, and not the accused, who, so far at least as words were concerned, manifested a disposition to provoke a difficulty. The deceased first spoke to the defendant, and asked him, "Is that you, Lee?" The accused answered, "Yes," which is the only word, agreeably to the testimony, spoken by the accused to the deceased on that day; and then he was told to come up, as one witness says, "and I will settle with you for what you have said." According to the other he was told, "Come up here, and I will run you again," or something like that; and when he failed, and then by his acts declined

a contest, he was told by the deceased that he would settle with him when they got across the river.

The deceased crossed the river in advance of the accused, and when the boat, which subsequently conveyed the defendant across the river, was nearing the bank, the deceased, having laid his gun down on some rocks near by, stood near the landing, bantering the defendant to come ashore that the contest might commence; and, on the accused leaving the boat, he was rudely accosted and either pushed or struck by the deceased, which was returned by a blow from the accused with the stick carried by him across the river, followed by the deceased picking up a stick and with it returning the blow, when, the stick failing the deceased, he started in the direction of his gun, saying, "Give me my gun; I will kill the d——d rascal."

From this statement of the meeting of the parties, and judging as best we can of the motives by which they were actuated on that occasion, as shown by their words and actions, the killing is referable to a sudden difficulty provoked and brought about by the deceased, rather than that the accused was prompted to action by a former difficulty, or upon a plan deliberated upon and formed in the mind of the accused to take the life of the deceased, or to then do him any serious bodily harm. If the conduct of the accused was caused by that of the deceased in provoking a difficulty, and, after the parties had come to blows, if the subsequent acts of the accused, which resulted in the death of the deceased, were caused by passion or rage engendered by the conflict, or by fear on account of his condition at the time—and either was the motive which prompted the action —it was not a killing on express malice, and not murder in the first degree.

There was error in refusing a new trial on the two grounds set out in the motion, and for this error the judgment is reversed and the cause remanded.

*Reversed and remanded.*