## JOHN HILL *v.* THE STATE.

1. INTENT. — Every person is presumed to understand the probable result of his acts, and when an unlawful act is clearly shown to have been committed, it is for the defendant to show facts which mitigate, justify, or excuse, so that a reasonable doubt, at least, may arise upon the entire evidence as to his guilt.

2. CHARGE OF THE COURT. — In a trial for murder, where the evidence creates the slightest doubt that the crime may be graded below murder in the first degree, and yet be a malicious killing, it is the duty of the court to give the jury an opportunity to pass upon that doubt. In this case it was not error to charge the jury on murder in the second degree.

3. MANSLAUGHTER. — In order to reduce a homicide from murder in the first or second degree to manslaughter, because of insulting words or conduct to a female relative, it must appear that the killing was really on that provocation, and that it took place immediately upon the uttering or happening of the insulting words or conduct, or so soon thereafter as the party killing met with the person killed, after having been informed of the insulting words or conduct.

APPEAL from the District Court of Montgomery. Tried below before the Hon. J. MASTERSON.

The opinion states the case.

No brief for the appellant.

*George McCormick*, Assistant Attorney-General, for the State.

ECTOR, P. J. The defendant was indicted for the murder of John Wells. On a trial by jury he was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for forty years. A motion for a new trial was made, but overruled, and an appeal taken.

The main questions in this cause arise upon the charge of the court to the jury. The statement of facts shows that John Hill, the defendant, killed John Wells, in the county of Montgomery, on August 24, A. D. 1877. On the trial, defendant sought to reduce the homicide to manslaughter, because of insulting words and conduct by the deceased. The case made by the evidence is, in substance, as follows: At the time of the homicide, John Wells and John Hill were living at the house of Mrs. Mattie E. Denton. Wells was then between seventeen and eighteen years old, and Hill between eighteen and nineteen. Wells was cropping with her, managing her place, under her directions. He commenced living with her in November, 1876. Hill came to her house in April, 1877, and from that time had lived with his aunt, Mrs. Denton, until the homicide. He worked sometimes, but not regularly. Mrs. Denton was a widow lady, and had five children, the oldest, Lula, a daughter, who was ten years of age at the trial.

We make the following extracts from Mrs. Denton's evidence. She testified as follows, to wit: "On the evening of August 24, 1877, between two and three o'clock, John Hill and John Wells were sitting on the gallery of my house. John Hill said he was ready to go to work. I asked John Wells if he was ready to go to work. He answered, 'No;' that he was going to gather and shell corn to go to mill. John Hill then asked John Wells, 'What

ridiculous stories have you been telling the woman Margaret, at Post's mill, about Aunt Mattie?' John Wells replied that ' he had not told any; if she said so she lied, and if any one else said so, they lied.' John Hill then said he would not stand it much longer, and went into the room and got his pistol, and walked out on the gallery and fired at John Wells, and then went around in front of him and shot at him twice more, or the pistol went off twice more, I do not know which. John Wells was sitting, leaning against a post on the gallery, with a knife in his hand; had been peeling and eating peaches while sitting there. * * * Wells's feet were on the gallery floor, upon which he was sitting. In a moment or two after he was shot he fell out on the ground, and was soon dead. After Hill shot Wells, he came into the house and asked me for his carpet-sack. I gave it to him. He then stepped to the door and asked me for his coat, and walked out of the house, and took my horse and left. I did not see him any more until I saw him at the jail in Anderson."

On cross-examination, she testified that " when the defendant spoke of Aunt Mattie, he meant me; that just after dinner of that day I went into my room and found John Hill there, leaning with his hand upon the mantelpiece. He asked me what these things were that John Wells had been saying about me. I told him what had occurred; that I was not surprised to hear that John Wells had been talking about me; that he had done worse. I then told him that John Wells had at one time tried to pull me down on the bed; that he had accused me of going to bed with Garrett Scott, and had accused me of improper intimacy with almost every gentleman who visited the house, and had said to me many other things that I cannot find suitable language to express. This conversation occurred just after dinner. John Hill went out on the gallery. John Wells was there. After cleaning up the table and closing the doors, I went to

hunt my work-basket, and went out on the gallery, sat down, and took my work and commenced sewing. Hill was reading, or apparently reading, a book, and Wells was sitting, leaning against a post of the gallery, when the conversation commenced which immediately preceded the killing. When Wells tried to pull me on the bed, Sallie Floyd was in the cook-room ; and my child Lula, when I screamed, came into the room and hit Wells with the broom.''
*   *   *

On the reëxamination she stated : '' I have told several persons about the insulting words and conduct of Wells toward me ; don't recollect to whom I stated them. I told about it before John Hill was arrested, but cannot now remember to whom ; I cannot tell to whom I told these facts, either before or after the arrest of John Hill. *   *   *   I made no statement before the coroner's jury of inquest about the insulting language and conduct of John Wells towards me. I was not asked about it.''

Lula Denton, the second witness placed on the stand by the State, in her evidence differed in no material particular from her mother in regard to the killing, and the conversation on the piazza which immediately preceded the killing, and in which her mother, the defendant, and the deceased all took part. On cross-examination she said : '' When John Wells tried to pull ma down on the bed I was on the gallery. I heard ma scream. I went into the room and saw Wells pulling her. I struck him with a broom.'' *   *   *

Margaret Duncan testified as follows : '' I live at Mr. Post's mill. I knew John Wells, and saw him just before they say he was killed. I never told him, nor did he ever tell me, anything about Mrs. Denton. I knew John Hill, the defendant. I never told him anything that John Wells told me about Mrs. Denton. John Wells never told me anything about Mrs. Denton.''

We find some evidence in the record in relation to a trial of the deceased about two months prior to the killing, before a magistrate, on the charge of unlawfully carrying a pistol, in which the defendant was a witness against. Wells. We make the following extract from the testimony of the witness Smott:

" Wells and Hill seemed to be friendly at the time of the trial about the pistol, and seemed to be so after that time. I did not know that there had been any feeling between them until some time after this, and about two weeks before the killing. When John Hill was riding with me on my wagon to mill, he told me that ' he had taken more off of John Wells than he ever had any other person, and that he would not stand it much longer.' I was, after this, with Hill and Wells. I saw one or both of them every few days. I saw them together after the conversation spoken of in my direct examination. I did not at that time attach much importance to the remark."

The first objection to the charge of the court is that it keeps prominently before the minds of the jury the question of the intent with which the homicide was committed. We cannot commend the charge for its brevity. There are one or two expressions in the charge, when the court is attempting to instruct the jury under what state of facts the defendant would be guilty of murder in the first degree, which had best been omitted. The court first defined murder in the language of the statute; gave the distinctive difference between murder in the first degree, murder in the second degree, and manslaughter; properly defined express and implied malice; explained to the jury under what circumstances a homicide would be reduced to the grade of manslaughter, by reason of insulting words or conduct by the deceased toward a female relative of the slayer; and gave the defendant the benefit of the presumption of inno-

cence and of a reasonable doubt, not only as to the highest offence included in the indictment, but also as between the different degrees of the offence.

As the jury did not find the defendant guilty of murder in the first degree, the accused has no just cause of complaint, even if the charge of the court on murder in the first degree, when applied to the facts, was not a very clear and accurate enunciation of the law.

We have carefully examined the entire charge, and, take it as a whole, we do not believe it is liable to the first objection made to it by defendant. The doctrine of intent, as it prevails in the criminal law, says Mr. Bishop, an eminent philosophical writer on the criminal law, is necessarily one of the foundation principles of public justice. When one person kills another, the killing must be done with malice aforethought to make the crime of murder. It is a principle of the common law, as old as the law itself, that all homicide is presumed to be malicious until the contrary appeareth from the evidence. This is the law in Texas. In the case of *Farrer* v. *The State*, 42 Texas, 265, the Supreme Court say: "It is a familiar axiom of the law that every person is presumed to understand the probable result of his acts. And when an unlawful act is clearly shown to have been done, it is for the defendant to show facts which mitigate, excuse, or justify it, so that a reasonable doubt, at least, may arise on the entire evidence in the case as to his guilt. Hence, when the killing is proved, and it is not shown to have been done under sudden passion, induced by an adequate cause, or under circumstances which excuse or justify it, such killing must be regarded as voluntary and designed, and, therefore, with the malice which the law imputes to such homicide."

The charge in this case, in drawing the distinction between murder of the first degree, murder in the second degree, and manslaughter, gives sufficient prominence to

the mental condition of the accused to enable the jury to correctly determine whether Hill killed Wells with malice aforethought, or under the immediate influence of sudden passion, arising from an adequate cause.

The second error assigned is, " that the court erred in submitting to the jury the question of murder in the second degree at all in the cause, because the facts proven show either murder in the first degree or manslaughter; and in this cause there was given to the jury, by charging murder in the second degree, a chance for a compromise verdict, when, if murder in the first degree and manslaughter were alone charged, as was the law of the case, the jury would not have found higher than manslaughter."

We cannot say that this assignment of error is well made, or that any injury resulted to the defendant because the court submitted to the jury a charge on murder in the second degree. In any case where the defendant is indicted for murder, and the facts in evidence create a doubt, however slight, that the case might be graded below murder in the first degree, and yet be a malicious killing, it would be the duty of the court to give the jury an opportunity to pass upon that doubt. *Halbert* v. *The State*, 3 Texas Ct. App. 661. Appellate tribunals are not inclined to disturb verdicts for the cause last assigned, unless it appears that injustice has been done to the accused.

It is insisted by defendant's counsel, and assigned as error, that the court in its charge to the jury presented, in a manner, too forcibly, the effect of the weapon used, in ascertaining the intent with which the homicide was committed. The most serious objection on this point, we think, arises on the following subdivision of the charge: " But if you have a fair and reasonable doubt whether the facts in evidence establish the guilt of defendant of murder in the first degree, then consider and find from the evidence if the defendant is guilty of murder in the second degree,

as already defined.  If there was no express malice, no deliberate and cool purpose formed in the mind of defendant, prior to the act of killing, to take the life of John Wells, followed by killing by the use of a deadly weapon; then if you find from the evidence that the act of John Hill, resulting in the death of John Wells, was committed by said Hill from a transport of passion of such a character as to have rendered him incapable of reflection, although the provocation producing such a state of mind was not sufficient in law to extenuate the killing and reduce it to manslaughter; yet if, before the killing, he intended to kill said Wells,— if the intention existed for a moment of time before the act,— then the law implies malice where the evidence shows that the means or weapon used was intended to, and was reasonably calculated to, effect the purpose intended; then, unless the facts in evidence reduce the offence to manslaughter, you will find the defendant guilty of murder in the first degree.''

After a careful examination of the above paragraph, and, in fact, all other portions of the charge where any reference is made to a '' deadly weapon,'' we believe the charge is so qualified as not to be liable to the objections urged against it.  The jury were pointedly and properly instructed under what circumstances the law would reduce a homicide to the grade of manslaughter, because of insulting words and conduct of the person killed towards a female relative of the party committing the homicide.

We make the following extract from the charge on this point: '' There are various causes which, by the law, are considered adequate causes, so as to constitute what would otherwise be murder in the first or second degree to manslaughter.  In this case, the cause sought to be made by the defendant is ' insulting words and conduct ' of the person killed towards a female relative of the party guilty of the homicide.  Where it is sought to reduce the homicide

to the grade of manslaughter, by reason of the alleged insults to a female relative, it must appear from the evidence that the killing took place immediately upon the happening of the insulting conduct or the uttering of the insulting words, or so soon thereafter as the party killing may meet with the person killed, after having been informed of such insults. The jury, in every case where such defence is sought to be put up, will consider the evidence, and from it determine whether, under all the circumstances, the insulting words or gestures were the real cause which provoked the killing. In order to reduce a voluntary homicide to the grade of manslaughter, it is necessary, not only that adequate cause existed to produce the state of passion or emotion known as anger, rage, sudden resentment, or terror, rendering the mind incapable of cool reflection, but it is also necessary to satisfy the jury that such state of mind did exist at the time of the commission of the offence.''

And again, near the close of the charge, we find the following instruction: '' If the proof satisfy you that Hill was a relative of Mrs. Denton, and the proof further shows that the deceased had used insulting words or conduct toward Mrs. Denton, and if it further appears from the evidence that the killing took place immediately upon the happening of the insulting conduct or the uttering of the insulting words, or so soon thereafter as Hill met Wells, after having been informed of such insults, then under the law of manslaughter the defendant is guilty of manslaughter, and you will in that case so find.'' This last instruction is a clear cut of the law as applicable to the facts in this case. Pasc. Dig., arts. 2254, 2255. The jury were at liberty to determine whether, under all the circumstances, the insulting words and conduct of the deceased towards the aunt of the accused was the real cause which provoked the killing; and if so, whether the accused

acted with that promptness which the law requires to reduce the killing to the grade of manslaughter. If the defendant acted upon what his aunt, Mrs. Denton, told him of the insulting words and conduct of the deceased towards her, the jury may reasonably have concluded that he did not kill Wells as soon as he met with him after having been informed of such insults; but, on the contrary, waited for an hour or more in the presence of the deceased, until sufficient time had elapsed for cool reflection. Or it is equally reasonable to conclude that the jury believed the defence attempted to be made available by the accused was an afterthought, — a trumped-up story. No exception was taken to the charge of the court at the trial, and no additional instructions were asked by the defendant.

We have given the case that careful examination and consideration which its importance demands, and have discovered nothing that would warrant a reversal of the judgment. The judgment of the District Court is, therefore, affirmed.

*Affirmed.*