ROBERT WYNNE v. THE STATE.

No. 428. Decided February 16, 1910.

Rehearing denied April 19, 1910.

**1.—Murder in the First Degree—Motive.**

In order to support murder in the first degree the law does not require that the State must show a motive for the killing. If the facts show a deliberate killing, the result of a formed design in a mind cool, calm and self-possessed, then it is murder in the first degree.

**2.—Same—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence showed a deliberate killing, and that the same was planned by the defendant and his companion, a conviction of murder in the first degree is sustained although no motive was shown of the killing.

**3.—Same—Cool and Deliberate Mind—Lapse of Time—Express Malice.**

The intention to kill may be formed and it may be put into execution at

the very moment of time it was formed, and where the party committing the homicide was calm and self-possessed and formed a design to kill, it is upon express malice and murder in the first degree.

Appeal from the District Court of Walker. Tried below before the Hon. S. W. Dean.

Appeal from a conviction of murder in the first degree; penalty, imprisonment in the penitentiary for life.

The opinion states the case.

*T. E. Humphrey* and *Ben H. Powell,* for appellant

*John A. Mobley,* Assistant Attorney-General, and *Duncan, Hill & Elkins,* for the State.

McCORD, Judge.—The appellant was indicted, tried and convicted of murder in the first degree and his penalty assessed at life in the penitentiary. From this conviction he has appealed to this court.

1. In the motion for new trial in the court below and in the brief of counsel for appellant in this court no complaint is made of the charge of the court below. No bills of exceptions are found in the record and the only point urged as ground for reversal is the insufficiency of the testimony to support the verdict. The contention of appellant is that the evidence does not raise this offense to a higher grade than second degree murder and that the State, failing to show a motive for the killing and there being an absence of any ill-will or feeling previous to the night of the killing, the case stands against the appellant in this case upon the fact that it was an unexplained killing and for that reason the case should be reversed. In order to support murder in the first degree, we do not understand the law to be that the State must show a motive for the killing. Motive for the killing may be a circumstance, if one exists, and is susceptible of proof and could be offered, but if the other circumstances of the case show a deliberate killing, the result of a formed design in a mind cool, calm, and self-possessed, then it would be murder in the first degree. The facts in the case, briefly stated, are as follows: That deceased and Hollis Wells and Arthur Stanfield, white boys, were on their way to Bowden's store, traveling along a road which passed near Ed Gorman's house, who was a negro; that when they reached Gorman's house they found a party was going on and stopped to see it; that Ed Gorman was giving a supper and that the fellow Robert Wynne was assisting him; that the three white boys went into the house and bought some things from Gorman or Wynne, and that deceased and Stanfield then went out of the house; that immediately after they left the house appellant and Gorman also left, Gorman with a shotgun in his hand, followed by Robert Wynne with a pistol in his hand; that deceased and Stanfield were walking from Gorman's house and going in the direction of where their horses were hitched when Gorman and

appellant fired upon White and killed him. The wounds upon White showed shotgun wounds and a pistol wound, which entered the forehead just above the eye, and passed through the base of the brain. When White and Stanfield left the house, Wells, the other white boy, started to follow them, but when he reached the east door he found it shut and guarded by a négro with a shotgun. He turned to go out of the west or back door and found that also guarded by a negro with a shotgun. We think the appellant and Gorman deliberately planned to kill deceased. This fact is shown by the evidence in this: There were 200 or 300 people in the house; Robert Wynne was assisting Gorman in the sale of the viands constituting the supper, and when Gorman left the house with the shotgun in his hand to follow the boys, Robert Wynne left with him. When Hollis Wells started out from the house behind Wynne and Gorman he was refused exit, thus showing that preparation had been made by Gorman and Wynne to prevent the crowd or anyone in the house from following them out and witnessing the murder. The presence of the two negroes at each door could not have happened, and could only have occurred through the instrumentality of Gorman and Wynne, thus showing a deliberate conspiracy to take the life of deceased, showing preparation for it and arrangements against discovery or against being prevented in the deliberately planned murder. Charles Holman, a negro, testifying for the State, said: "Robert Wynne and Ed Gorman went out of doors together. Ed Gorman had a shotgun and Robert Wynne a pistol. After Robert and Ed went out of the house Mr. White was going towards his horse, or mule, or whatever he was riding, and he looked around, and Robert and Ed were coming behind, and Mr. White looked around and they fired at him—both of them fired at him— Robert and Ed both—and when one gun fired, they both fired about the same time. Ed had a shotgun. Robert had a pistol. Mr. White fell. I don't know how came them to commence, but they shot at him. I saw, Robert and Ed come out of the house together. Ed had a shotgun and Robert a pistol. This young man was walking off and just as he turned to look back at them Robert and Ed fired on him and he fell. He was going from the house. He was going from Ed and Robert. . . . After the shots were fired Robert Wynne went back into the house. After he went in the house I did not see him go out any more, but him and Ed went back in the house. I did not hear any conversation between them after they went back in the house, only Ed said, 'I have killed one dam white son-of-a-bitch and I will kill the other one.'" These boys (White, Wells and Stanfield) walked out of the house and Robert Wynne and Ed Gorman followed them out and shot them down. Memphis Mack testified: "I was at Ed Gorman's house the night that Mr. White was killed. I saw Mr. White when he was killed. When he was killed Robert Wynne made one shot. I do not know who made the other shot. Robert shot with a pistol." Arthur Stanfield testified: "I was present when Marion White was

killed. He was killed at Ed Gorman's house at the southeast corner. This was in Walker County, Texas. I think it was the 19th day of September, 1908. Hollis Wells and Marion White were with me that night when Marion White got killed. We had been to prayer meeting down there at the church before going there that night. We were going to Bowden's store. The road passed about fifty yards of Ed Gorman's house. We stopped in there. They seemed to be having a festival there. I suppose there were 200 people there, or maybe more. We had been in the kitchen there at the house. The kitchen was at the west side of the house, and we went out of the back door and started around the south end, and as we got to the southeast corner he (White) was shot. I do not know who shot him. I don't suppose we were over a foot apart when he was shot. I felt the concussion of the gun; it powder-burned my face. Mr. White was not making any demonstration or any act towards a demonstration or anybody at the time he was shot. There were twenty-five or thirty shots, maybe not so many, maybe more, fired after he was shot. I did not shoot any. Mr. White was killed. He was near the southeast corner of the house at the time he was shot. . . . I think there were two shots fired, but they were so near together it seemed almost like one, but it seemed to me like there were two flashes of powder hit me in the face. I never saw the form of any man. The shot was fired from around the corner of the house. I don't suppose the man was out in view. The shot was fired from around the corner of the house. It was fired from around the southeast corner. I never saw where the man was standing, but the shot came from around the corner." Hollis Wells testified: "I was at Ed Gorman's house the night that Marion White was killed. I was in the house. There were two other white men that went in the house with me. They were Marion White and Arthur Stanfield. I was in the house at the time Marion was killed. I was in the shed room, that is, the west room. I saw Arthur Stanfield and Marion White go out of the house. They went out of the west door. After they left the room I saw Ed Gorman and Robert Wynne go out of the house. Ed had a shotgun and was ahead and Robert was behind with a six-shooter. They went out of the east door, that was the front door. After they got out there were some shots fired. I heard these shots in just a few seconds after Ed and Robert left the house. These boys went out of the back door and then these two negroes went out of the front door and in a few seconds I heard the shots fired. The shots sounded like they were at the southeast corner of the house. I afterwards saw Marion White. The shots were in the general direction of Marion. After the shots were fired Ed and Robert came back in the house. Ed came in the front door and Robert in the back door. When they came in Ed Gorman said that he had killed one of the dam white sons-of-a-bitches. Ed Gorman said that. Robert Wynne never made any statement. Immediately after the first shots were fired there was some more shooting. I could not tell you how much

more there was.  There were a good many shots fired.  .  .  .  After the shooting commenced I started to the front door and there was a fellow there with a double-barreled shotgun—I mean by saying a fellow that there was a negro there.  He was guarding the door.  I saw him there and I turned and walked back to the other door and there was one there, and about that time the shooting commenced, and the women screaming and hollering.  After the negroes went out with the guns, and the shots were fired, and I started out of one door and a negro was guarding that door, and I went to the back door and there was another negro guarding that door.  I stayed there; there wasn't any way to get out.  After Robert came in the west door and shot the pistol off twice, and Ed was standing there in the room with his gun laid over his arm this way (indicating) I started out and laid my hand on the door and he said, 'Take your hand off that door,' and I took it off and I laid it there again and he said the same words, and I stood there a minute, and all at once I grabbed the door, pulled it open and jumped out."  T. C. Oliphant testified: "I examined the body of Marion White after he was killed.  I helped to dress him and prepare his body for burial.  I examined the body for wounds.  I found wounds in his head.  Some of the wounds struck about here (indicating) and glanced; that is, they struck about the top of the skull.  These wounds ranged up as well as I could tell.  There was one wound just about the center of the forehead and it seemed to go straight through and there was also another one over the eye, just above the eye, and it seemed to strike this (indicating) bone, and ranged downward just a little, out the back of the eye out above the eyeball."

We think under the above statement of facts that the killing was a deliberate killing; that it was planned by the appellant and his partner, Gorman.  The proof shows that the deportment and bearing of the appellant and Gorman were cool, calm and circumspect, both immediately before the shooting and immediately thereafter.  There is no evidence in the record whatever of either passion or excitement.  There is a total absence of any obvious or known cause to disturb appellant's mind or arouse his passion.  The very nature and character of the act done, the instrument used, as well as the manner in which the murder was committed, show a deliberate killing.  Murder in the first degree is not determined by a design to kill, unless that design originated in, or resulted from a sedate, deliberate mind, or, in other words, at the time the design to kill is formed the mind must be calm, sedate and deliberate; but as said by Judge Moore in Farrer v. State, 42 Texas, 265: "These words, indicating the state of mind when the design is formed, are not, however, to be understood in an absolute and unconditional sense, for it would be almost impossible that anyone, not altogether devoid of human sensibilities, and reduced to the level of the brute, could deliberately design to take the life of a fellow-being, with an absolutely calm and unruffled mind, without any char-

acter of mental excitement whatever. Still they certainly import that the mind is sufficiently composed, calm, and undisturbed to admit of reflection and consideration on the design. That it is in a condition to comprehend and understand the nature and character of the act designed, and its probable consequences and results. The act must not result from a mere sudden, rash, and immediate design, springing from an inconsiderate impulse, passion, or excitement, however unjustifiable and unwarranted it may be. For in such case the sedate, deliberate mind is wanting, and without it there can be no express malice." See McCoy v. The State, 25 Texas, 33.

It seems to be the contention of appellant in this case that because of the short lapse of time that intervened between the arrival of the boys at the house and the killing, the law, by reason of this fact, would make the offense no higher grade of murder than murder in the second degree. This, however, can not be the rule to guide the court in determining the degree of murder. The intention to kill may be formed and it may be put into execution at the very moment of time, yet if the facts surrounding the killing, the manner in which the killing takes place, the conduct of the party before and after the killing, all go to show that the mind of the party was calm and self-possessed, and that the design to kill was formed in such a state of mind, it is as truly murder in the first degree as if the design had lodged there for months. As said by Judge Moore in Farrer v. State, supra: "But, as has been frequently held by this court, it does not follow, because the killing may be the result of the prompt and speedy execution of a hasty or immediate resolution, that it may not have been done with express malice. The law has no scales to measure the time in which a sedate, deliberate mind may reach a formed design to kill, or do some serious bodily injury, which may probably result in death. When such design is once formed, the haste with which it is put in execution in no way affects or modifies the character of the act, or the degree of guilt thereby incurred." In the case at bar there were no words spoken before the killing, appellant showed no displeasure at the presence of the boys, but shortly after the boys left the house to go and get upon their horses the appellant and Gorman left also. The night was dark; Gorman had a shotgun and appellant had a pistol; they said nothing as they left; they walked out, fired upon the deceased, White, killed him, came back in the house and said not a word, only Gorman remarking, "We have got one of the dam white sons-of-a-bitch." The witness Wells had been left in the house when the boys started out, and when he saw the appellant and Gorman leaving, armed, he started to go out; he found both doors guarded by negroes with shotguns and was ordered to stand back. The very quietude of appellant, the mysterious stillness that surrounded appellant and Gorman before the shooting and after the shooting, and at the time of the shooting, together with the deliberate manner in which the plan was carried out, all go to show that Gorman and the appellant formed in

their minds the design to kill. This design was formed in the mind when it was cool, calm and self-possessed and the deliberateness with which it was executed makes it a case of murder in the first degree, and even in this kind of a case the quickness with which the parties acted, in itself, is a circumstance to be taken into consideration as showing the deliberate purpose of the parties. The secretiveness which surrounded the whole matter shows the diabolical methods that surrounded the execution of the plan. We are constrained to hold, in view of the facts of this case, that appellant was justly found guilty of murder in the first degree. There is not a suggestion in the record that the deceased and the boys that accompanied him to this place said a word or did an act that anyone could have become offended at. The house stood by the side of the road. Appellant, Gorman and others were having a social festival and were selling refreshments. The deceased and his two friends, passing along the road, got down off the horses, went into the house, bought some refreshments, paid for them and after they had finished went out of the house and as they were going to their horses were fired upon and White killed. Not a word was spoken, and we might say the oppressive silence and mystery which the conduct of the appellant and Gorman threw around themselves, indicated that the hearts of appellant and Gorman were fatally bent on mischief, and that they had a total disregard of human life. In the light of the record, as it is here presented, we are constrained to hold that the verdict of the jury in this case finding the appellant guilty of murder in the first degree, should not be disturbed. Finding no error in the record the judgment of the court below is affirmed.

*Affirmed.*

[Rehearing denied April 19, 1910.—Reporter.]