## WILLIAM TAYLOR *v.* THE STATE.

1. REINSTATEMENT OF AN APPEAL. — A sufficient showing being made that appellant was recaptured before a motion to dismiss his appeal on account of his escape was entered and sustained, the order of dismissal is set aside and the appeal reinstated.

2. CONFESSIONS. — No statement made by a party while in jail or legal custody is competent evidence against him, even as a mere link in the chain of evidence, unless it was voluntarily made before an examining court, or was voluntarily made after caution that it might be used against him, or unless, in connection therewith, he made statement of facts or circumstances found to be true, and which conduce to establish his guilt. And it is immaterial that the offense for which he was in custody when he made the statement was a different offense than that on the trial for which it is offered in evidence.

3. MURDER — CHARGE OF THE COURT. — Trying a murder case, the court below charged the law applicable to murder of the first degree, but gave no instruction on the second degree or its punishment, and none on that degree was asked by the accused. Nevertheless the jury found the accused guilty of murder of the second degree, and assessed his punishment at ten years in the penitentiary. *Held*, that the conviction must be set aside, irrespective of any inquiry whether the evidence required any instruction on the second degree.

4. QUÆRE. — If the court below omitted to instruct the jury as to the punishment for a less degree of felony than that charged in the indictment, and the jury convicted of such less degree, and assessed the punishment at the *minimum* of the punishment prescribed for it, is the omission error of which the accused can avail himself?

5. JURIES are not the judges of the law in any case, but are bound to be governed by the law given in charge to them by the court.

6. MALICE — CHARGE OF THE COURT. — Though it was erroneous to instruct that the unintentional killing of one man, without malice, done in an attempt to kill another with express malice aforethought, is murder of the first degree, yet, if the accused was found guilty in the second degree, the error was not to his prejudice.

APPEAL from the District Court of Calhoun. Tried below before the Hon. T. C. BARDEN.

At the September term, 1874, of the District Court of Calhoun County, James Taylor and the appellant, William Taylor, were jointly indicted for the murder of Gabriel

Slaughter on March 11, 1874. What has become of James Taylor or his case is not disclosed by this record.

The case against William Taylor, the appellant, was tried at the spring term, 1875, and the jury found him guilty of murder in the second degree and assessed his punishment at ten years in the penitentiary. His motion for a new trial was overruled, and from the judgment entered upon the verdict he appealed.

On April 23, 1877, at the Austin term of the Court of Appeals, the attorney general, acting on a report made to him by the sheriff of Calhoun County, suggested the escape of the appellant, and moved that his appeal be dismissed; which motion was sustained on the 26th of the same month.

On May 18, 1877, counsel for the appellant moved that the appeal be reinstated, alleging that, at the time the motion to dismiss was made and sustained, the appellant was in legal custody; and in support of the motion an affidavit of Dennis Corwin, Esq., sheriff of Travis County, was filed, showing that the appellant was placed in his custody on April 20, 1877, and was by him held to await further proceedings in the case. Upon this showing the court set aside its order of dismissal, and reinstated the appeal.

In this record we have an inadequate account of one of the many bloody incidents which illustrated a sanguinary feud between two factions, known as the "Taylor party" and the "Sutton party," which, to the terror of a peaceful and orderly community, disturbed for years one of the fairest sections of Texas.

As the steamer "Clinton" was preparing to leave the port of Indianola, in the county of Calhoun, on March 11, 1874, about two o'clock in the afternoon, William Sutton and Gabriel Slaughter were suddenly shot down and instantly killed on the deck of the vessel. Many persons were on deck, but the state was able to introduce but few of them as witnesses.

Ed. McDonough, for the state, testified that he went to
the steamer in the same hack with Sutton and his wife and
Gabriel Slaughter, and was on the deck of the vessel when
the shooting was done.   As the hack approached the vessel,
witness noticed the appellant and another man standing
near by.   Witness went on board and from there saw Sut-
ton, Mrs. Sutton, and Mr. Keran standing at the hack, and
noticed that the appellant and his companion were stand-
ing near the hind wheel of the hack watching them.
Slaughter had followed witness on to the vessel.   When
Sutton, his wife, and Keran came aboard, the appel-
lant and his companion followed them.   Sutton and his wife
went towards the cabin ; Slaughter was behind witness, and
appellant also passed to the rear of witness and towards
Slaughter.   The companion of the appellant then com-
menced shooting Sutton, and almost immediately witness
heard shooting behind him.   Appellant's companion had
two pistols and fired twice in rapid succession at Sutton,
and just as the second shot was fired, or instantly after it,
witness heard the shooting commence to his rear, where
Slaughter and the appellant had gone.   At least two shots
were fired there, and witness thought there were more.
Sutton and the man who shot him were in front of witness
while the shooting was going on ; Slaughter was to the rear
of witness.   Witness ran to the room near the cabin and
turned around towards the scene, and could just see
Slaughter's feet as he lay on his back.   Witness then saw
appellant's companion pursuing and still firing at Sutton,
and saw appellant leave the vessel just as Sutton fell in the
room.   Witness did not see who shot Slaughter, but saw
no one pass to his rear, previous to the firing, except
Slaughter and the appellant.   Witness did not see Slaugh-
ter have a pistol on board of the boat before he was shot, but
knew that he had one before he came aboard, and saw it
lying by him after he was shot down.   Slaughter was shot

in the face, and Sutton in the breast and head. As the appellant left the vessel he had a six-shooter in each hand, and he and the man who shot Sutton mounted their horses and rode off fast. When the shooting commenced, at least a dozen persons were there, but they scattered instantly, and great excitement prevailed. Witness observed the horses ridden by the appellant and his companion; one was a sorrel, and the other a brown, horse.

On cross-examination the witness stated that he had never seen the appellant prior to noticing him on the wharf on the day and just before Sutton and Slaughter were killed. On that occasion he was within five feet of him. Some three weeks afterwards witness saw a man in the river bottom, near Victoria, who he thought at the time might be the appellant, and, if witness had then been asked if that was the man who killed Slaughter, he would not have answered the question. Witness had heard that the Taylor boys were then in that neighborhood, and, on seeing the man in the bottom, the idea occurred to him that the man might be the same who accompanied the man who shot Sutton on board the vessel. Subsequently, however, witness went with one of the appellant's counsel to the county jail, and was there introduced to the appellant, and recognized him instantly as the man witness had seen aboard the steamer. Witness had no desire to recognize him, and bore him no ill-will. This witness further stated that Slaughter's pistol, after he had fallen, was half-cocked, and about ten inches from his hand.

J. N. Keran, for the state, testified that, some five days before Sutton and Slaughter were killed, he came to Indianola by rail, and was introduced to James Taylor on the cars. The appellant, also, was on the cars. This witness also went with Sutton and his companions to the wharf in a hack. When witness got out of the hack he saw James Taylor and the appellant standing near the cattle-chute, thirty or forty steps from the vessel. A brown and a sorrel

horse were hitched to the chute. Witness saw Sutton, Slaughter, and the Taylors after they went on board. At Mrs. Sutton's request he had started to get tickets for her and Sutton, and was half-way round the steamer, and near the forward hatch, when the shooting commenced. There seemed to be four or five shots in quick succession. Witness went towards the firing, and saw Sutton just as he fell; saw James Taylor fire the last shot, but did not see the appellant just at that time. The Taylors left the vessel, and mounted the brown and the sorrel horses and rode off. A pistol, half-cocked, was lying by Slaughter. Witness picked it up and examined it; one barrel was empty, and all the others loaded. Witness gave the pistol to Mrs. Sutton, and when she left the vessel he accompanied her; and, on again examining the pistol, thought that the empty barrel had been recently discharged.

C. Surrenson, for the state, testified that he kept a livery-stable in Indianola, and that, between one and two o'clock of the day on which Sutton and Slaughter were killed, James Taylor got from him two horses — one a brown and the other a sorrel. Several men were with James Taylor, and a boy rode off with him. Witness did not think the boy who rode off with James Taylor was the appellant. Subsequently witness was paid for his horses.

Peter Tharp stated that he was standing at the end of the stage-plank while the shooting was going on, and saw all that transpired. He saw Sutton and his companions when they came on board, and the shooting then commenced immediately. According to this witness, the two men who did the shooting were already on board before Sutton and Slaughter got on the vessel; and there were some other circumstantial discrepancies between his account and the testimony of previous witnesses. He stated, however, that the two men who did the shooting left the vessel, and rode off together on two horses which had been tied to the cattle-

chute, and that one of them shot one of the men who were killed, and the other shot the other.

Mrs. Laura Sutton, the widow of William Sutton, testified, for the state, that she knew James Taylor, but not the appellant. Witness did not see James Taylor on board the vessel when she went on board, but recognized him as the man who killed her husband, and saw him and another man go off on the horses. She had just stepped down the passage leading to the cabin, and was about to enter the cabin, when the pistol-shots were fired, and saw a man shooting, whom she recognized as James Taylor. She stated the number of Sutton's pistol, and knew that he had it on when they went to the vessel; and she identified it with a pistol exhibited to her in court.

Reuben Brown was the state's witness whose testimony is referred to in the opinion of this court. He knew the appellant, and, as marshal of the town of Cuero, arrested him, after the killing of Sutton and Slaughter. He did not arrest him upon that charge, however, but for carrying on his person a pistol, the number of which was 21418, the same number as that previously stated by Mrs. Sutton to be that of her husband's pistol. While thus in arrest for carrying the pistol, the appellant voluntarily told witness he wanted the pistol, and asked what would be done with it; and witness told him it would be sold for the benefit of the town of Cuero. Appellant asked witness to buy it in for him even if it cost $100, saying that it had belonged to his deceased uncle Buck. Witness would have bought the pistol but that it was not sold. It was a Smith & Wesson's pistol, and the appellant's uncle Buck died before they were patented. Appellant delivered the pistol to the mayor of Cuero.

To the testimony of this witness about what was said by the appellant while in custody objection was interposed at the time, and, being overruled, a bill of exceptions was duly

taken. In certifying the bill of exceptions the judge thus explained his ruling: "Before the evidence was admitted, the witness, Brown, had stated that the defendant was not under arrest for anything connected with the crime for which he was being tried under this indictment, but for a violation of the city ordinance of Cuero, where he was arrested; that the statements made by defendant to witness were voluntarily made; that defendant wished to know whether he could purchase the pistol if it were sold, and, if he, defendant, was not present when it was sold, he requested the marshal, Brown, the witness, to buy it for him. The pistol proved to be that of William Sutton, murdered at the same time with Gabriel Slaughter, on the steamer "Clinton," on March 11, 1874.

"I did not consider the statement in the nature of a confession at all. It was not made as a confession, and it was not made while under duress, so far as relates to the crime with which he was charged. He was simply arrested, as witness stated, for violation of a city ordinance, by the city marshal, and, while so in arrest for such offense, made the request testified to by witness Brown."

O. L. Threlkeld, for the state, testified that he was the mayor of Cuero, and that he handed to the district attorney the pistol exhibited in court. Witness had received it from Reuben Brown, and had kept it in his own possession.

John Meadows, for the state, testified that he knew the pistol taken from the appellant by Brown, and knew it to be Sutton's pistol. He saw Sutton buy it in Ellsworth, Kansas; knew its number to be 21418, Smith & Wesson's patent, and that the pistol produced in court was it.

The state introduced several other witnesses, who testified to collateral facts tending to identify the appellant as the man who coöperated with James Taylor in the massacre of Sutton and Slaughter. But the testimony already stated, though greatly condensed by the omission of repetitions and

immaterial circumstances, is believed to present fully the case made by the evidence for the state.

John Taylor, for the defense, testified that about March 15, or 16, 1874, a few days after Sutton and Slaughter were killed, he was at B. J. Pridgen's, in DeWitt County, with James and William Taylor and others. After staying all night the party started off together, and had gone up the road a piece when James Taylor told William, the appellant, that he had forgot that pistol, and that, if he, the appellant, would go back to Pridgen's and get it, he would make him a present of it. While the appellant was gone after the pistol, James Taylor told witness that it was the Sutton pistol, and that he took it from Sutton when he killed him. This was before the arrest of the appellant. It was a white-handled Smith & Wesson pistol, like the one exhibited in court.

William Longnecker, the keeper of a bridge some twenty miles from Indianola, testified for the defense that James Taylor and another man crossed the bridge in the evening of the day on which Sutton and Slaughter were killed. Their horses seemed to have been ridden hard. Witness did not think the appellant was the man who was with James Taylor on that occasion; but he would not positively swear that he was not. This concluded the evidence in the case. The opinion of this court supplies all other matters.

*Phillips, Lackey & Stayton,* for the appellant.

*George McCormick,* Assistant Attorney General, for the State. The testimony of the witness Brown was properly admitted. The record shows that, at the time the prisoner made his statement to Brown relative to the pistol (which was shown on the trial of the cause to have been the pistol of Sutton, and taken from him at the time he was killed), the prisoner was confined upon a charge of unlawfully carry-

ing a pistol in the town of Cuero, an offense entirely distinct and disconnected from the one for which he was being tried, and having no connection whatever with it. Now, the statute which provides that a confession shall not be used against a defendant, if at the time it was made he was in jail, evidently intends to protect the prisoner only from having his statements relative to the crime for which he is arrested, or charged with having committed, used in evidence against him.

A careful reading of the statute in question (Pasc. Dig., art. 3137) shows this view to be correct, or else why does it provide that such confession can be used after the prisoner has been cautioned? Certainly he could not be cautioned when it is not known that a crime has been committed, or that he is suspected. Again, the statement made by the prisoner to Brown was not a confession within the meaning of the statute, and, if a confession at all, was made in the case for which he was then under arrest.

A statement made by a prisoner before he is charged with the crime is admissible against him. Roscoe's Ev. 36, note 1, and cases there cited. See, also, Burrill on Cir. Ev. 500.

The court charged the law applicable to murder in the first degree only, but the jury found the prisoner guilty of murder in the second degree, and assessed the punishment for this latter offense.

The facts show that, if the prisoner was guilty of any crime, it was murder in the first degree. He was either guilty or not guilty of murder in the first degree.

I submit that the court did not err in failing to charge the law applicable to murder in the second degree or manslaughter, because there was absolutely nothing in the evidence tending to show such offenses had been committed. There was nothing in the evidence which, if believed by the jury, would have reduced the offense — nothing upon which

such charges could have been predicated; indeed, it would have been error had the court given such instructions.

Again: when the court charges the law as made applicable by the proof in the case, the defendant is not injured, and will not be permitted to complain. *Vaughan* v. *The State*, 21 Texas, 752; *Ross* v. *The State*, 29 Texas, 499; *O'Connell* v. *The State*, 18 Texas, 344; *Johnson* v. *The State*, 27 Texas, 706; *Hudson* v. *The State*, 40 Texas, 13; *Jones* v. *The State*, 40 Texas, 188; *Mayfield* v. *The State*, 44 Texas, 59. See, also, the opinion of this court in *Holden* v. *The State*, 1 Texas Ct. App. 236, where it is declared, "if the judge should believe from the evidence that the party accused is guilty of murder in the first degree, he is not required to do more than charge as to murder in the first degree."

If, then, under the facts in the case at bar, the court was not required to define the lesser degrees of murder, and the jury, regardless of the law and the facts, have assessed a punishment less than that to which the prisoner was entitled, he ought not to be heard to complain.

ECTOR, P. J. The appellant and James Taylor were jointly indicted for the murder of Gabriel Slaughter, which is charged to have been committed on March 11, 1874. The jury found the appellant guilty of murder in the second degree, and assessed his punishment at ten years' confinement in the penitentiary

We are of opinion that there are material errors in the proceedings upon the trial, for which the judgment must be reversed. On the trial of the cause the court admitted in evidence, over the objections of appellant, the testimony of the witness Brown, as to the declarations made by appellant while in prison. This evidence was evidently introduced to form a link in the chain of testimony to convict the appellant. In this we think the court erred.

The fact that the declarations were made while he was in prison upon another charge does not alter the case. The statute is imperative which declares that the confession shall not be used, " if, at the time it was made, the defendant was in jail or other place of confinement, nor while he is in custody of an officer, unless such confession be made in the voluntary statement of the accused taken before an examining court in accordance with law, or made voluntarily after having been first cautioned that it may be used against him ; or unless, in connection with such confession, he make statement of facts or of circumstances that are found to be true, which conduce to establish his guilt, such as finding of secreted or stolen property, or instruments with which he states the offense was committed." Pasc. Dig., art. 3127.

The evidence was material. It tended to show that the appellant desired to secrete the pistol identified as belonging to one Sutton, who was in company with Gabriel Slaughter when they were both killed. This pistol Sutton had with him when he was killed ; and this testimony was also doubtless offered to show that appellant, in whose possession it was found, was present when the killing occurred.

Our Code provides as follows :

" Art. 3058 [Pasc. Dig.]. The jury are the exclusive judges of the facts in every criminal cause, but not of the law in any case. They are bound to receive the law from the court, and be governed thereby.

" Art. 3059. After the argument of any criminal cause has been concluded, the judge shall deliver to the jury a written charge, in which he shall distinctly set forth the law applicable to the case ; but he shall not express any opinion as to the weight of evidence, nor shall he sum up the testimony. This charge shall be given in all cases of felony, whether asked or not."

The court did not charge the law applicable to murder in the second degree or manslaughter. It did not instruct them

as to the legal definition of "*implied malice*," or the punishment of murder in the second degree. The court should not charge the jury on the law of murder in the second degree when there is nothing in the evidence to require it. The judge is only required to charge the law applicable to the facts in evidence. At the same time, to sustain a verdict of conviction of murder in the second degree, the jury should have been instructed by the court upon the different degrees of murder, and informed by the court as to the punishment which might be assessed for either grade, whether the appellant asked such instruction or not.

The finding of the jury is conclusive as to the grade of the offense, and was received and made the basis of the judgment. It might be urged with some plausibility, if the punishment assessed by the jury had been the lowest punishment permitted by law for the offense of murder in the second degree, then, that the appellant would have no cause to complain. But it was not; the jury exercised their own discretion, unrestrained and uninformed. In a criminal case the jury should be distinctly charged as to the punishment which may be imposed by their verdict. The jury have no other guide but the court to direct them in finding their verdict. It is made their duty by the statute to receive the law from the court and be governed by it. The finding of the jury in this case is strange and unaccountable.

The court also committed an error in charging that express malice towards Sutton would render the unintentional killing of Slaughter, without malice, murder in the first degree, if Slaughter was killed in attempting to kill Sutton. Such killing would be murder in the second degree; but, as the appellant was not convicted of murder in the first degree, it is an error of which he cannot be heard to complain. *Farrer* v. *The State*, 42 Texas, 265; *McCoy* v. *The State*, 25 Texas, 33.

The question to determine is not whether the prisoner is guilty. It is whether he has been tried and convicted as the law requires. Conformity to the requirements of the law are no less important to the best citizen than to the worst criminal. There are safety and security for none unless the laws are faithfully, fairly, and impartially administered. The highest and best security for the preservation of our rights and liberties is a substantial adherence to the requirements of the law prescribed for judicial proceedings.

The judgment of the District Court is reversed and the cause remanded.

*Reversed and remanded.*