Williams & Williams, of Mount Pleasant, for appellant.

Lloyd W. Davidson, State's Atty., of Austin, for the State.

LATTIMORE, J.

Conviction for manufacturing intoxicating liquor; punishment, one year in the penitentiary.

Officers went to appellant's house to execute civil process. They did not find appellant. One of them observed a path leading from appellant's house down to a branch, and in the path was a track which the witness described as a "big track." Officer Little followed this path some 300 yards to a branch. Just a little ways there was a fork in the branch, at which place two empty barrels were sitting. The officer followed the branch down to where he saw a smoke, and upon going a little further he said he could see a boiler steaming up and a man sitting down about 4 feet from the boiler. Little walked on up to within about 20 feet of appellant, watching him as he approached. He said that a whisky still was there and in operation; that it consisted of a 50 or 55 gallon oil drum for a cooker; that there was a coil and thump keg, and a fire under the still which was making whisky and paying off into a bucket. He further testified that when he got within 20 feet of the still he stepped on a stick and made a noise. When he did so appellant raised up and said "Hugh," and, when he saw who it was, right across the branch and up the hill he went. Witness said he shot four or five times; that he had known appellant for three or four years. Other officers testified to going with Mr. Little to the place, describing the trail, and to seeing the still which was destroyed. This all occurred in the daytime. One of the officers who testified said he thought it was between 12 and 1 o'clock.

Appellant put on the stand his son-in-law and several other negroes who testified to an alibi, claiming that they saw appellant at various and sundry hours during that afternoon at the home of said son-in-law. The court submitted a proper charge on alibi, telling the jury that, if they found defendant was at another and different place from that at which the offense was committed, or if the evidence raised in their minds a reasonable doubt that he was present at the time and place the offense was committed, they should acquit him. The court out of abundance of caution seems to have charged the jury on circumstantial evidence.

There is complaint of the refusal of two special charges, one asking a peremptory instruction of not guilty, and one presenting the defense of alibi. We think the refusal of neither presents any error. The evidence seems to amply support the conclusion of guilt.

The judgment will be affirmed.

## STEADHAM v. STATE.
### No. 13891.

Court of Criminal Appeals of Texas.

June 24, 1931.

Rehearing Granted Nov. 13, 1931.

James A. Harrison, of Beaumont, for appellant.

Lloyd W. Davidson, State's Atty. of Austin, for the State.

LATTIMORE, J.

Conviction for murder; punishment, ninety-nine years in the penitentiary.

That appellant killed his wife is admitted. He said he cut her with a knife. In addition to the stab wounds, the facts showed that her skull was crushed by a blow in the back of the head which caused her eyes to protrude. A bloody axe was near her body. No facts support any theory of justifiable homicide:

Appellant seems to rely on a supposed right to kill his wife if she was taken in adultery or under circumstances reasonably justifying the belief that she had committed adultery, or was about to commit same. Such is not the law. Billings v. State, 102 Tex. Cr. R. 338, 277 S. W. 687; Jiminez v. State, 103 Tex. Cr. R. 163, 280 S. W. 829; Jordan v. State, 107 Tex. Cr. R. 137, 294 S. W. 1109. On the witness stand appellant gave conflicting accounts. He said: His wife spent the afternoon at the apartment of Gus Riggs and his wife. That he went to said place about 6 o'clock and remained until about 7:30 or 8. That while there appellant's wife asked Bertha Riggs for the key to the toilet. The toilet, used in common by occupants of the apartment, opened on an alley. A door originally leading from the Riggs' apartment to this toilet had been nailed up. Only a wall was between the Riggs' apartment and the toilet. Appellant testified that, after his wife got the key to the toilet and left the room, he waited some twenty or thirty minutes and then himself left to go to his home for the purpose of getting his wife's fur coat and shoes. Returning with said articles, he knocked at Riggs' door, and upon invitation entered. We are summarizing from appellant's testimony. He asked if his wife had come back, and Bertha Riggs told him she had not. Appellant said he did not know where she could be, that she got the key to the toilet, and it was now wide open and she was not in there. He asked Bertha Riggs if Smith was at home. Smith was a negro man who occupied the other downstairs apartment of said house. Bertha said she did not think he was. Appellant went to Smith's door and pulled on it but it was hooked. Smith came to the door and was asked by appellant if his wife was there. Smith said "No." Appellant asked Smith if he could come in and see, that he believed she was there. He testified that

he heard some one in the bed. Smith refused to let him in, saying he was sleepy and had to go to bed early. Appellant said, "If you won't let me come in and see, I'll have a man here in a minute that you will let see," and ran down toward the corner of the block, but doubled back and heard Bertha Riggs say, "Come on out now, he is gone." Bertha was standing at the toilet door. When she made that statement appellant's wife came out of Smith's room, having on nothing but a slip and Bertha Riggs' coat. He walked behind her into the house and jumped on her, using his knife, and did not know how bad he hurt her. He was standing near the toilet when his wife came out of Smith's room and went into the Riggs room. He did not jump on her out in the yard, but followed her into the house, where she turned and looked at him, and he cut her. He did not know whether he used the axe or not. The above reflects his direct testimony. On cross-examination, he swore that he saw his wife in Smith's room; that he went around to the door of the toilet and saw her in said room with Smith, but did not go on in because it was a violation of the law to break into somebody's house. He further said he had seen her in said room and knew she was there when he went around the corner of the block; also that after he saw her in there was when he went to Smith's door and knocked and asked the latter if his wife was in there; that he knew she was in there when he told Smith he would go and get a man. He knew this because he saw her in there. He admitted that he might have said on direct examination that he did not see her in there, but in fact he did see her. He admitted that he said nothing to his wife before he stabbed her; asked her for no explanation. She was doing nothing to him when he stabbed her. Did not know how long he stayed there and watched her before he stabbed her.

He also swore he suspected that his wife was in Smith's room when she asked for the key to the toilet. He said he heard her open the toilet door and go in, and that he sat there about twenty minutes and she did not come back, and he never had heard the door (toilet door) open again, so he just went there and looked and she was not in the toilet and the key was still in the door. He did not look in Smith's room then, but, when he came back from his trip home, some eighteen blocks, he pushed open the door between Smith's room and the toilet and looked in Smith's room. He said he did not go into Smith's room because he was scared; Smith was liable to have a pistol. He said he saw his wife in said room sitting on the side of the bed and Smith was in there with her. He did not call to her or tell her to come out, nor did he then knock on the door. His explanation of why he did not tell these things on direct examination was that he did not think about them, but he knew he did look into that room and his wife was within four or five feet of him when he did so.

Practically all of appellant's testimony was contradicted. Smith was placed on the stand by the state and denied that the woman was in his room at any time, and said that he never met her except a few moments in the Riggs apartment that evening. He testified that appellant did come to his room and ask if his wife was in there, and was assured by witness that she was not. He said he heard the screaming later in the Riggs apartment He affirmed that the bed in his room was in such position that it could not be seen by a person in the toilet, even if the door was open. This was also affirmed by other witnesses. Riggs and his wife swore that appellant and his wife were at their apartment on the night in question; that deceased ate with them. Both said they sat around and talked, and that deceased bade them good-night and went away. They did not know where she went. Appellant sat a while longer and left. He said nothing about his wife before going. Both testified that they then went to bed, and the next they knew was when they were awakened by the screaming of deceased in the front room of their apartment. They ran out, and deceased was lying on the floor. Bertha Riggs denied the statement attributed to her by appellant. Other testimony showed the presence of a bloody axe and the character of the wounds on the body of deceased.

Bill of exception No. 1 complains of the refusal of a continuance. No process is attached to the application or shown in the bill. We are not impressed with the materiality of the absent testimony. The refusal was not erroneous.

Bill No. 2 brings forward exceptions to the court's charge. The exception that same should have told the jury that appellant should be acquitted if he found his wife in such situation as to cause him to believe she had committed adultery, or was about to commit adultery, with Smith, did not contain a correct statement of the law, and is of no merit. The second ground of said exceptions was that the charge omitted the affirmative defense of appellant, viz.: That he had seen his wife in a compromising position with Smith under circumstances which reasonably led him to believe that they had committed adultery, or were about to do so; that said charge fails to apply and give appellant the benefit of such facts as applicable to malice aforethought. We confess ourselves not quite able to perceive the specific character of such an exception. Pinkerton v. State, 94 Tex. Cr. R. 127, 249 S. W. 1066; Regittano v. State, 96 Tex. Cr. R. 477, 257 S. W. 906; Morris v. State, 96 Tex. Cr. R. 605, 258 S. W. 1065; McCauley v. State, 97 Tex. Cr. R. 1, 259 S. W. 938. If the record presents any affirmative

defense, same was not called to the attention of the court by such exception. No part of the charge given is pointed out as objectionable, nor was any special charge asked covering any theory or contention of the defense as not being fully set out in the charge given. Moore v. State, 96 Tex. Cr. R. 121, 255 S. W. 988; Houseton v. State, 95 Tex. Cr. R. 596, 255 S. W. 188; Prestidge v. State, 88 Tex. Cr. R. 561, 228 S. W. 217.

█ The remaining exception is stated in the bill as follows: "The typewritten addition to paragraph five of the charge is error which is as follows: 'Malice may arise in a very short time as within a twinkling of an eye,' in that the same is unnecessary, confusing and improper and erroneous, and on the weight of the evidence." That malice may arise in the shortest space of time has often been affirmed by our court. In the early case of Farrer v. State, 42 Tex. 273, it is said: "But, as has been frequently held by this court, it does not follow, because the killing may be the result of the prompt and speedy execution of a hasty or immediate resolution, that it may not have been done with express malice. The law has no scales to measure the time in which a sedate, deliberate mind may reach a formed design to kill, or do some serious bodily injury, which may probably result in death. When such design is once formed, the haste with which it is put in execution in no way affects or modifies the character of the act, or the degree of guilt thereby incurred."

Again in Duebbe v. State, 1 Tex. App. 166, this court said: "If the defendant designed to kill the deceased, or to inflict upon him, by any unlawful means, any serious bodily injury which might probably end in his death, the law does not and cannot define any precise time as necessary for deliberation. The operation of the mind in deliberating may take place in the shortest interval—even the moment before the act, as well as months before—and the deliberate intention of the mind is manifested by external circumstances."

Gaitan v. State, 11 Tex. App. 560, quotes with approval what is above set out as said in Farrer v. State, supra. In Sherar v. State, 30 Tex. App. 353, 17 S. W. 621, 623, Judge Davidson, for the court, says: "The law, however, does not prescribe any length of time in which malice may be engendered. If the mind be cool the malice may be formed in a moment of time, even so quick as the working of the intellect or the conception of thought. These matters must be relegated to the facts attendant upon the particular case."

These cases and others deemed illustrative were handed down when express malice was a definite factor of murder in the first degree. In Garza v. State, 11 Tex. App. 345, we held that a sudden killing, effected by means such as would likely cause death, would naturally give rise to the inference that it was upon express malice. In Campbell v. State, 15 Tex. App. 506, appears a case where without proof of ill feeling between the parties such facts were shown surrounding the killing as to make it appear one upon express malice, and it is said that, if the manner and means of the homicide are such as to justify that conclusion, the fact that the killing is sudden, without proof of grudges, etc., would not prevent it being a killing upon express malice. Appellant cites us to no case supporting his contention, and by no analysis makes it appear likely that the giving of the charge last quoted could have been of injury to him. We are confronted with our statute, which forbids us to reverse for complaints of the charge unless we believe the matter complained of or calculated to injure the rights of the accused. See article 666, C. C. P. Again summarizing the record, we observe that no witness corroborates appellant as to what occurred at the time of or prior to the homicide. If we seek to ascertain his feeling and attitude at the time he killed his wife, from his own testimony, we must believe that his wife, in his presence, asked for the key to the toilet, separated from the room in which he sat by only a wall; that he heard her unlock the toilet door and go in; that after waiting twenty minutes, though he said he suspected her of being in Smith's room, he made no move but left the premises, went eighteen blocks to his home and back, saw the key was still in the toilet door, went into said toilet, pushed open a door opening from this toilet into Smith's room, saw his wife sitting on the side of the bed, turned around and went out into the alley and into the Riggs apartment, asked if his wife was back, went to Smith's door, knocked, and asked Smith, who came to the door, if his wife was in there, was told she was not, demanded to see and was refused, said he would find a man and ran to the corner of the block, came back, and heard Bertha Riggs, standing at the toilet door, say, "Come on out, he has gone," saw his wife come out and go into the Riggs room, followed her, and stabbed her with a knife and brained her with an axe. We are asked to reverse such a case upon our belief that the accused, whose testimony we have just set out, was harmed by the giving to the jury of a statement that malice may arise in the shortest space of time. We utterly fail to see how this could have harmed him. If he was swept off his feet by passion, if bereft of power of self-control by observing his wife in the room with another man in a compromising position, why did he not hurl himself upon the guilty pair when he first saw them in Smith's room? His explanation was that he was afraid Smith had a pistol. This called for a little cool reasoning. He also gave as a further ground that the law forbade entry into another man's house. More reasoning. After observing this, according to his own testimony, he went into Riggs' apartment, made inquiries about his wife, knocked at the door, and conceived the idea of running

a block and doubling back, and then when his wife appeared a few feet from him he did not undertake to act, but followed her into the room, where he killed her by the use of a knife and axe. The charge excepted to is not to be commended, and under different facts might be deemed injurious.

We have examined the other bills of exception, and do not think the matters complained of reflect any abuse of the discretion confided in the trial court, or show any error that would call for a reversal.

The judgment will be affirmed.

MORROW, P. J. (dissenting).

The offense is murder; punishment assessed at confinement in the penitentiary for ninety-nine years.

Johnnie Steadham, a negro, killed his wife, Clara Steadham. They had been married about two years. They visited the house of one Riggs. The appellant left and returned later in the evening. Upon his arrival, his wife, Riggs and his wife, and one Smith were present. It seems that the Riggs family and Smith lived in separate parts of the same house. The appellant departed about 7:30 o'clock. Before he went, his wife asked him for the key to the toilet and stated that she was going there. The appellant went home to get his wife's coat and shoes. On his return to the Riggs house, his wife had not returned. After making inquiry for her, he went to Smith's room. Smith came to the door, which was fastened. In reply to the appellant's inquiry as to the whereabouts of his wife, Smith said that she was not there. Appellant asked for the privilege of looking in the room, and Smith admitted that she was there. The appellant heard some one in the bedroom, but Smith refused to let him enter. The appellant left, remarking that, if Smith would not let him come in and see, he would have a man there who would do so. The appellant stepped aside and made the appearance of leaving, but returned shortly. Appellant said: "I rushed right away and doubled back. When I doubled back, Bertha Riggs was standing right at the toilet door. She did not see me. She said, 'Come on out, he is gone.' Clara then came out of the door. She had nothing on but her slip and Bertha Riggs' coat. I walked on behind her into the house and jumped on her."

Smith testified and denied that Clara Steadham was in his house. He also denied having any conversation with the appellant.

Bertha Riggs and her husband testified that they were in bed and that they first became aware of the trouble by hearing the deceased scream. The appellant claimed to have attacked his wife with a knife. The state presented the theory, through circumstances, that he also used an ax. This the appellant denied. After killing his wife, the appellant called up the officers and surrendered. On cross-examination the appellant said: "When I saw my wife going into Gus Rigg's house after coming out of Smith's house, I followed in right behind her immediately. * * * I don't know whether she screamed at all or not, but I guess she did. * * * I don't know whether I was wild when I saw her or not. I had a bad feeling over me. * * * When I saw her it naturally made me have a bad feeling all over me. * * * I saw her in his room. I saw her in there through the toilet door. * * * I stood there and watched her before I stabbed her with this big long knife. * * * When I saw her like that it made me crazy. I knew what I was doing before that."

Various exceptions were addressed to the court's charge. Among others was the use of the expression "malice may arise in a very short time as within the twinkling of an eye." Another exception was that the court entirely omitted a charge on the affirmative defense of the appellant; namely, that his state of mind, upon seeing his wife under the circumstances, led him to believe that she was in the act of adultery.

An application for a continuance on account of the absence of Henry C. Langham was made and overruled. According to the application, the witness was under subpoena, but was seriously ill with a carbuncle on his neck and was unable to leave his room. The testimony expected was the knowledge of the appellant's reputation as a law-abiding citizen.

Bill of exceptions No. 5 presents no matter requiring discussion. The condition of the body of the deceased indicated that she received a blow on the back of the head. There was an ax in the room in which she was killed. It belonged to Riggs and was standing against the wall. There was some blood on the handle of the ax and on the ax itself. There were no finger prints upon either of them. The state relied upon circumstances alone to prove that the appellant used an ax in killing the deceased. The appellant's counsel stated in argument that, if the ax had been the weapon used, there would have been finger prints thereon which experts could have identified. This remark of the appellant's counsel was regarded by the trial court as inviting the remark of counsel for the state wherein he said, "Finger-prints make no impression upon an ax or ax-handle." The statement of each counsel appears to be in the nature of evidence.

The expression, "malice may arise in a very short time as within the twinkling of an eye," embraced in the charge on malice aforethought, is an innovation, and, so far as the writer's information goes, has not been used in any reported case in connection with the definition of malice aforethought. In some case it might be of little moment. However, in the present case, it certainly should not

have been embraced in the charge. There is no indication from the evidence that prior to the time the appellant assaulted his wife they were not on the best of terms. The only reason deducible from the evidence for his assault is that which he gave; namely, that he believed from the circumstances detailed that she had engaged, or was about to engage in sexual relations with Smith. That such belief, under the circumstances, might have resulted in an assault without malice cannot be questioned. The expression that malice aforethought might occur "within the twinkling of an eye," as expressed by the court, was susceptible of appropriation by the jury as indicating the view of the court upon the particular facts in evidence. To the mind of the writer, the use of the language criticized in the definition of malice was, under the circumstances, erroneous. Viewed in the light of the evidence, it cannot be said that it did not operate to the prejudice of the accused. The court gave no charge on the converse of malice aforethought. It is understood to be the settled law of this state that, in a case where there are mitigating facts in evidence, a charge is incomplete which merely submits the theory of the state and fails to present the theory of the accused as arising from the evidence. See Craiger v. State, 48 Tex. Cr. R. 505, 88 S. W. 208, Drake v. State, 46 Tex. Cr. R. 448, 80 S. W. 1005, and many other cases collated in Branch's Cr. Law, pp. 295, 296. See, also, Branch's Ann. Tex. P. C. p. 1101; Gaines v. State, 58 Tex. Cr. R. 631, 127 S. W. 181, and other cases collated in section 1958.

"Malice aforethought" is the voluntary and intentional doing of an unlawful act by one of sound memory and discretion, with the purpose, means, and ability to accomplish the reasonable and probable consequence of the act; and includes all of those states of mind under which the killing of a person takes place without any cause which will, in law, justify, excuse, or extenuate the homicide. It is a condition of the mind which shows a heart regardless of social duty and fatally bent on mischief, the existence of which is inferred from acts committed or words spoken.

Malice aforethought denotes the state of mind of the slayer at the instant preceding the unlawful act which results in the death of his adversary. Premeditation is an essential element of malice aforethought. To warrant the jury in assessing a penalty of more than five years' confinement in the penitentiary, they must believe beyond a reasonable doubt that the killing was prompted by malice aforethought as above defined and explained. When a person is killed by the voluntary act of another, the one who slays is not guilty of murder with malice aforethought if, at the time the intent to kill is formed, his mind was in a condition incapable of that premeditation which characterizes malice afore-

thought as that term is hereinabove defined. And, unless the jury believes, beyond a reasonable doubt, from the facts and circumstances introduced before them, that at the time of the homicide the mind of the accused was in a condition to form the design to kill the deceased with malice aforethought and that the homicide was prompted by malice aforethought, the punishment of the accused, if found guilty, cannot be in excess of five years' confinement in the penitentiary. That the state of mind in which a criminal act is done is an element in the extent of his guilt is fundamental, and in the recent murder statute, article 1257a, Vernon's Ann. P. C., this is taken into account in the following section of the statute: "In all prosecutions for felonious homicide the State or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the homicide, which may be considered by the jury in determining the punishment to be assessed. Provided, however, that in all convictions under this Act and where the punishment assessed by the Jury does not exceed five years, the Defendant shall have the benefits of the suspended sentence act."

In all criminal prosecutions of the grade of felony the trial court is commanded by law to give to the jury a written charge informing them of the law governing the particular case. Such compliance with that statute can be made alone by giving consideration to all of the facts that may be lawfully considered by the jury. In a homicide case in which there are mitigating facts in evidence, a charge which fails to instruct the jury touching the legal effect of such mitigating facts fails to obey the command of the statute requiring a written charge.

In the opinion of the writer, the judgment should be reversed and the cause remanded.

### On Motion for Rehearing.

HAWKINS, J.

In his motion for rehearing appellant calls our attention to bill of exception No. 8 which seems to have been overlooked in considering the case on original submission. It is apparent from the majority opinion and the dissenting opinion that the court's attention centered upon other questions than the one presented by such bill. There was no denial by appellant that he had killed his wife. His whole defense was based upon the proposition that he was caused to commit the act because he had seen his wife in Smith's room and had seen her come out of the room only partly clothed, and, believing that she had had sexual relations with Smith, he killed her.

The defense was not a negation of guilt but mitigation of punishment.

Bill of exception No. 8 reflects that Smith was placed upon the witness stand by the state at about 10:30 at night. He testified that appellant's wife had not been in his (Smith's) room at all on the occasion in question. Smith was the last witness used by the state, and, after the state rested its case, appellant's counsel stated to the court that on the day before the trial began Smith had stated to appellant's counsel in the presence of Ed Clem and Cleveland Connor that appellant's wife had been in his room on the night of the killing, and only denied that they had sexual intercourse; that appellant's counsel, having no reason to think Smith would testify differently, had made no effort to have Clem and Connor present as witnesses. Upon cross-examination, Smith was asked if he had not on the day before the trial began told Clem and Connor that appellant's wife was in his room on the night of the killing. The witness denied having made such statement or anything to that effect. He admitted talking to the parties mentioned on the occasion inquired about, but asserted that he told them appellant's wife had not been in his room on the night of the killing. At the time this matter developed, it was 10:30 o'clock at night. Appellant's counsel requested the court not to close the evidence then, but to hold the case open until 9 o'clock the next morning and give him an opportunity to get in touch with Clem and Connor and produce them in court. The bill recites that the court stated he would not let the case go over until morning, but would give counsel until 12 o'clock that night to produce the witnesses. Counsel for appellant then stated that he did not know where to find them, and that it would be impossible to get them at that time of night and again requested that the evidence be not closed but that appellant be given until 9 o'clock the next morning, since the witnesses lived in the city of Beaumont where the case was being tried. This request was refused by the court, and the bill states that when the witness Smith finished testifying "the court ordered the evidence closed and it was closed."

Attached to the motion for new trial were the affidavits of Connor and Clem. Each of them made oath that the witness Smith had on the day before the trial was commenced made a statement in their presence in which he (Smith) admitted that the wife of appellant had been in his room on the night of the killing and a short time previous thereto, but denied that they had had sexual relations. Connor was a colored man who worked for Mr. Clem; the latter was a business man in the city of Beaumont and owned the apartment house in which Smith lived, whose apartment adjoined the one in which the killing occurred.

The effect of Smith's testimony, if believed by the jury, was to destroy appellant's claim for mitigation of the penalty. He was requesting an opportunity to present witnesses who would weaken Smith's unexpected evidence. It is well understood that ordinarily a case will not be continued or postponed, or a new trial granted, for purely impeaching testimony. Appellant was seeking none of these. The case was on trial and about to be concluded at 10:30 at night when the exigency arose which confronted appellant. His only request was that he be given until 9 o'clock next morning to produce the witnesses named. The request seems not unreasonable. On the other hand, it does seem unreasonable, under the circumstances, to have required the witnesses to be produced by 12 o'clock that night. If he had produced the witnesses the next morning and requested permission to use them he would have brought himself squarely within article 643, Code Cr. Proc. 1925, which provides: "The court shall allow testimony to be introduced at any time before the argument of a cause is concluded, if it appear that it is necessary to a due administration of justice."

The bill of exception reflects that the request of appellant to submit the witnesses at 9 o'clock the next morning "was refused by the court and when said Smith had finished his testimony, the court ordered the evidence closed and it was closed." If the court meant what he said when he ordered the evidence closed that night, it would have been useless to tender the witnesses the next morning. Under the facts certified in the bill, we are of opinion that appellant waived no right in failing to produce and tender the witnesses upon the reconvening of court next morning after the incident mentioned occurred. It cannot be held that the action of the court was harmless. As said before, the effect of Smith's testimony was to destroy appellant's claim for mitigation. If Smith's testimony had been weakened or destroyed by the proposed testimony of Connor and Clem, it is impossible to know what the attitude of the jury would have been towards appellant's claim.

Having become convinced that the court fell into error as shown by bill of exception No. 8, and that in all probability it resulted in harm to appellant, it becomes the duty of this court to grant the motion for rehearing, set aside the former judgment of affirmance, and reverse the judgment of the trial court, and remand the cause for a new trial, and it is so ordered.