# FEBRUARY 28, 1934

## ODELL ALLEN V. THE STATE.

No. 16277.   Delivered February 28, 1934.
Reported in 69 S. W. (2d) 129.

The opinion states the case.

*L. H. Welch,* of Breckenridge, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

MORROW, PRESIDING JUDGE.—Theft from the person is the offense; penalty assessed at confinement in the penitentiary for two years.

The evidence is in substance as follows: Ollie Kiser possessed a sum of money which he had carried in his pocket for some time. It was folded in a peculiar manner and a portion of it was in $100.00 bills. The total was $1260.00. The appellant and his wife had been divorced but apparently were on friendly terms. She maintained a place where strong drinks were sold. Kiser was a frequenter of the place. From Kiser's testimony we quote:

"While I was there I drank some peach brandy, which I got from Odell Allen's wife, and paid her for it. I think I drank four glasses. The defendant came there after a bit; I don't remember what he said; he poured up some more brandy, and we had another drink; he had the brandy in a tall glass, flared at the top; I drank out of that tall glass; Odell Allen gave it to me; and insisted on me drinking it. After I drank from that tall glass, it kinder paralyzed me. At that time I had on me about twelve hundred and sixty dollars in a purse, and some in my pocket; I don't remember the amount, but I figure it was less than twenty dollars. I had the twelve hundred and sixty dollars in my hip pocket. I drew that money out of the State Bank on the 13th day of March, 1931, and had carried it for a good while. That bank is located at Mineral Wells, Texas. * * * After I had taken that drink from the tall glass, it deadened me. The defendant took me to my car, and we went away, and while we were going to the car, in front of Mrs. Allen's house, he had

his left arm around me; I can recall some things during that time, and some I can't. When we got to the car, I was going to drive, but the defendant told me I could not drive, and he drove me away. As to where he drove me, it could not have been over two miles from town (Breckenridge); after we got away, I remember him saying, 'Now you drive,' and he put my foot on the gas (pedal) and helped me get a hold of the steering wheel; the car shot forward, and I fell over on the wheel; when I woke up, the defendant was not there. At one time he fumbled around my hip pocket, and I felt him feel of me, and I couldn't move. When I came to, the car switch was cut off, the glass windows were rolled up, and the doors were both shut. It was dark when I woke up. I straightened up and wondered where I was; then I remembered, and felt for my money, and it was gone; I was cold and stiff, and was hurting all over, and I got out of the car and walked around a little while; I got still colder and couldn't very well handle myself, and I made my way out of there. When I found myself, I got back to the highway and went back to Mrs. Allen's house and tried to find my money; then I went to Odell Allen's mother's place. I did not find the defendant Allen. It was nearly two months after that before I saw him, or two months and a half. While I drove around, my stomach cramped, and after I came back to Mrs. Allen's house, I have a nervous breakdown."

On cross-examination Kiser admitted that he had been a frequent visitor at the Allen home; that appellant and his wife were separated; that she kept a drinking place which had a bad reputation. Kiser testified that he and Mrs. Allen were drinking there for some time before the arrival of the appellant and that he (Kiser) had taken four or more drinks prior to the appellant's arrival; that he had no recollection of a fight, but he did have a black eye. "You ask me if it is not a fact that I was so far gone that I don't remember what happened?" (Answer) "I was so doped up that I did not know what I was doing." Kiser testified further:

"I do know whether the money was taken out of my pocket before or after Allen came. When he took me to the car, he felt my money with his hand. There are some things I can remember and some I can't. I would like to remember it all. * * * I do remember that his hand stroked my money, but I don't remember that Elsie knocked me out when he got there. He took me by the arm and we went to the car, and I tried to drive but could not. I don't remember that I ran the car into the porch. I don't remember where it stopped. He got into the car and took me away. * * * I didn't know when he got out of

the car. * * * The reason I have not been able to find the place where he left me, is because I was so doped up. When I came to myself, I was some where east of the highway, north of town; he drove me there and left me. That is just as true as everything else I have said and testified about. He took the money out of my pocket right when he left me; I remember him feeling over me; he raised me up. When the car stopped, my head hit the steering wheel and honked the horn, and it woke me up. *I figure that when he got out, he took my purse. That is my testimony about when he got my purse.* That was east of the highway and north of Breckenridge. I am sure about that. The money was in my left hip pocket. The steering wheel is on the left side of the car, and my purse was in the pocket on the opposite side from him, and he reached around me and got it out of my pocket and left me there. I don't know what time it was when I came to; it was late in the night. As to how I got back to town, I just wandered around, and drove the car in. I don't know what time it was when I got back to Elsie's. I went right straight there when I could travel. * * * I went there to see where Odell was. I don't think I asked her if she got my money. I am sure I didn't because I knew who got it. I went back there again because I thought maybe he would come back again, and was taking care of it for me. I could not tell you what time it was when he took the purse from me. When I left the place, I couldn't see."

Dr. Grover C. Wood testified that he had been a physician and surgeon for about eighteen years; that he was acquainted with the action of chloral hydrate, generally known as "knockout drops," of which a large enough dose was sufficient to render one incapable of handling himself; that when taken in connection with whisky or brandy it would cause pain, stimulate the brain, paralyze the person, cause sleep, make the patient limp, lower the temperature, cause a contraction of the pupils of the eyes and produce an unconscious condition; that from an overdose the patient would suffer from stomach pains. The doctor described what would probably be regarded as an overdose.

Appellant testified in his own behalf that prior to the occasion upon which Kiser claims to have lost his money he (appellant) worked at Caddo for T. L. Watkins for about eight months. His term ceased in September, 1932. Subsequently he worked for the Dutch Shell Oil Company. Watkins paid appellant $322.00 for his work. Payment was made in three $100 bills, with the balance in other currency. Appellant kept the money and used it in purchasing an automobile. It was

shown by other testimony that in purchasing the automobile appellant used three $100 bills. He explained in his testimony that one of these bills he received at Overton about a week before he saw Kiser. The three $100 bills were exhibited to his mother some four or five days prior to the occurrence upon which the prosecution is founded. Appellant's mother testified and corroborated him with reference to having seen him in possession of three $100 bills. Appellant claimed to have visited the dwelling of his wife, from whom he had separated, for the purpose of seeing his child, who lived with its mother. He testified that he was not aware of the fact that Kiser had any money on his person. Appellant claimed that when he returned to the place where he met Kiser, the latter was drunk, had insulted the appellant's wife, and was engaged in an altercation with her. He denied giving a drink to Kiser and said that his taking Kiser away from there was in an effort to do a friendly act. Kiser's face was scratched, and when he undertook to drive his car, he drove it against the porch. Appellant got in the car and drove Kiser to the east side of Walker Street, where he saw Zack Dennis, who wanted to help Kiser but who declined the help. Appellant then, according to his testimony, got out and left Kiser in the car and got in a truck with Tom Watkins. Appellant specifically denied taking any money from Kiser. After leaving with Watkins the appellant went to a dance. He returned to Overton and then went to Fort Worth, where he purchased a car. He returned to Overton and stayed two weeks with his sister. He first learned that he was indicted for the theft of Kiser's money after he returned to Breckenridge something like three weeks after the occurrence. He specifically denied putting his hands in Kiser's pockets.

On cross-examination appellant testified that he had served a time in jail in cause No. 2300 for selling intoxicating liquors in July, 1928. He was indicted for forgery in April, 1927. He was also indicted on a swindling charge for giving a "hot check," and served a time for that offense. He denied that the car he bought in Fort Worth was purchased with money taken from Kiser. He claimed that it was bought with money, part of which he had received from Watkins, who paid him $322.00, of which amount $200.00 was in $100 bills. Touching the other $100 bill used in buying the automobile, appellant said that he just happened to have three $100 bills. He disclaimed any knowledge of Kiser having any money. Appellant said that when he got out of Kiser's car, the latter said he could take care of himself. Appellant said he bought the car from M. B. Boggus and had a tax collector's receipt for the license. The

car was transferred to O. E. Allen. Appellant said he knew a man by the name of Braselton, but did not know him in person. It seems that Braselton was a collector. He received the license in January, 1933, after he was indicted. When he traded the car to the McCathren Motor Company, he gave them the license, and it was then that his attention was called to the fact that the license was not in his own name. The indictment for forgery in 1927 was introduced in evidence as was also the dismissal of cause No. 2108 against the appellant. He claimed that he endeavored to get his former wife as a witness and exhibited an application for a subpoena made on February 8, 1933. It was returned not found. Appellant also introduced a subpoena for the sheriff of Gregg County.

Appellant claims that he got one $100 bill from the Shell Company, and with that $100 bill and the two $100 bills that he received from the First National Bank at Fort Worth, he purchased the automobile with three $100 bills. Exhibits were introduced in connection with the testimony. Among them was the check drawn on the State National Bank at Mineral Wells for $2888.39, which balanced Kiser's account on March 13, 1931; a bill of sale from the Ernest Allen Motor Company for a Chevrolet 1930 model coupe, engine No. 1821596; an exhibit showing the transfer of a car of the same number and description mentioned, to the Ernest Allen Motor Company, signed by M. B. Boggus, vendor, on October 24, 1932. There were four exhibits showing the dismissal of prosecutions pending against O. E. Allen in 1928 and 1929, also exhibits showing subpoenaes for certain witnesses in behalf of the appellant, among which was a subpoena for Elsie Allen, not executed.

Transactions involving the automobile mentioned above in which appellant had purchased and transferred it in the name of another person were introduced in evidence.

The appellant's mother undertook to describe the movements of Kiser when he went to her house. He asked if Odell (appellant) was there, and received a negative reply. He then grabbed hold of the screen and shook it like he would tear the door open. He then went out to the car and the witness later saw him lying drunk in the car.

The locality in which Kiser was left by the appellant was controverted by the testimony of Zack Dennis, who testified in substance that he saw appellant and Kiser on East Walker Street in Breckenridge at the "Old Dutch Windmill," coming into town. Appellant was driving and asked the witness to assist him in putting Kiser to bed; that Kiser was drunk. Kiser told appellant to leave him alone; that he would be all right.

About that time Tom Watkins came along in a Chevrolet truck. He saw the appellant. Dennis did not know whether Watkins saw Kiser or not. From Dennis' testimony we quote:

"After Kiser had told the defendant to leave him alone, we got into the truck and came to town. The defendant and I had been standing there about twenty minutes when Watkins drove up. During the time I was standing there—the defendant did not go to Kiser and take a purse from his left hip pocket."

On cross-examination Dennis said that he was under indictment for a felony. He said that Kiser appeared to be drunk. He was not examined by the witness but he formed the opinion that Kiser was drunk. Dennis remained at the place where Kiser and appellant were for about thirty minutes.

Watkins testified that appellant had been in his employ and had lived with his family; that he had heard about Kiser losing his money; that he saw the appellant near the "Dutch Windmill" talking to a man in a Ford coupe. From Watkins' testimony we quote:

"Kiser was supposed to be there in the car. * * * I did not have any conversation with them to amount to anything. * * * Odell Allen asked me where I was going. * * * They got on the truck and come with me to Breckenridge."

Watkins testified that he did not remember the date of the incident mentioned.

Kiser testified that in March, 1931, he drew from the State National Bank of Mineral Wells the sum of $2888.39. On cross-examination, it was developed in evidence that after having checked out his money from the bank, Kiser bought a house and an automobile. He claimed that the amount of money taken from him was the remainder of what he had withdrawn from the bank. Considering the examination, direct and cross, it is thought that the introduction of the testimony of the banker and the exhibit of the check for $2888.39 drawn by Kiser at the time stated by him, was not harmful to the appellant for the reason that there was no testimony contradicting that of Kiser to the effect that at the time of the alleged robbery he had in his possession the amount of money mentioned by him, which was something over $1200.00. The above remarks relate to Bills of Exception Nos. 1, 2, and 3.

There was testimony to the effect that Kiser had folded the $100 bills in his possession with the $20 bills over them in a peculiar way, and that one of the bills had become stained from dampness in the pocket of Kiser. There was also some evidence that one of the bills with which appellant bought the automobile had a stain upon it.

Bill No. 4 is based upon the theory that the court sanctioned the use of Kiser as a witness in opposition to the law excluding witnesses when the rule was demanded. The bill contains the following:

"The witness does not hear well, and probably did not hear it. I will overrule the objection."

The testimony given by the witness, if any, is not set out in the bill. It is thought that the bill does not disclose any abuse by the district judge of the discretion which the law vests in him. See Art. 644, C. C. P., 1925; also Emmons v. State, 100 Texas Crim. Rep., 264; Steadham v. State, 119 Texas Crim. Rep., 475; Warrick v. State, 120 Texas Crim. Rep., 626, and other cases cited in Vernon's Ann. Tex. C. C. P., 1925, Vol. 2, Supplement, 1933, page 12.

Bill No. 5 relates to the cross-examination of the witness Zack Dennis, called upon behalf of the appellant. The witness was asked the following question:

"You are under indictment for the possession of intoxicating liquors for the purpose of sale, are you not?"

The objection urged was the fact that the witness was charged was not admissible as an impeaching fact. We think the precedents exhibit the contrary rule. See Hooten v. State, 33 S. W. (2d) 742; McMurray v. State, 45 S. W. (2d) 606.

Bill No. 6 reflects the appellant's complaint of the reception of the testimony of Hovencamp, deputy tax collector of Tarrant County. The witness produced certain records of a transfer of an automobile from M. B. Boggus to the Ernest Allen Motor Company, and the transfer from the Ernest Allen Motor Co. to O. C. Allen. Exhibit "C," to which reference is made in said objection, shows the transfer to O. C. Allen of an automobile described as a 1930 Chevrolet coupe, State License No. F-64-529. The exhibit is signed "Ernest Allen Motor Co. by I. M. Puckett." Exhibit "D" is a transfer from M. B. Boggus to the Ernest Allen Motor Co., in consideration of one dollar, of a Crevrolet 1930 model coupe, State License No. F-64-259. The testimony is regarded as relevant. It tends to show the appellant's conduct in using a name other than his own in dealing with the automobile which he claims to have purchased with money he had earned and which the state claims he had taken from Kiser.

Bills of Exception Nos. 7, 8, 9, 10, and 11 reflect the complaints of the appellant touching the proof of his transactions in purchasing and selling the automobile as reflected by the evidence hereinabove and as practically set forth in his own testimony.

Bill No. 12 reflects the effort of the appellant to go into the

details involved in a prosecution in which he and one Herring were jointly indicted. The court permitted proof that the indictment had been dismissed. The details sought to be proved dealt with the relative liability of the appellant and his code-fendant.

Bill No. 13 contains five subdivisions, each criticising the charge which was given to the jury by the court. Such of them as are deemed to present any legal question worthy of discussion have been referred to hereinabove.

Special Charge No. 1, which was refused, is in the following language:

"Gentlemen of the Jury: You are instructed that if you find and believe from the evidence that the money used by the defendant in purchasing the automobile from the Ernest Allen Motor Company, in Fort Worth, Texas, was money earned by the defendant while working for one Tom Watson and the Dutch Shell Oil Company, or if you have a reasonable doubt as to the same being true, you will find the defendant not guilty."

The refusal of the charge is deemed correct. The question was the theft of money from Kiser. The use of the three $100 bills in purchasing the automobile was a circumstance against the appellant but not conclusive of his guilt or innocence.

The precedents under article 1438, P. C., 1925, denouncing the offense of theft from the person, reveal the fact that the distinction between theft from the person, as defined, and ordinary theft and robbery invoke discussion to a considerable degree. Among the recent illustrations are the following cases: McFarlin v. State, 55 S. W. (2d) 844; Harris v. State, 118 Texas Crim. Rep., 597; Reese v. State, 91 Texas Crim. Rep., 457; Rylee v. State, 90 Texas Crim. Rep., 482.

The offense in the present instance is defined as follows:

"To constitute the offense each following circumstance must concur:

"1. The theft must be from the person; it is not sufficient that the property be merely in the presence of the person from whom it is taken.

"2. The theft must be committed without the knowledge of the person from whom the property is taken, or so suddenly as not to allow time to make resistance before the property is carried away.

"3. It is only necessary that the property stolen should have gone into the possession of the thief; it need not be carried away in order to complete the offense."

The statute is quoted in the charge of the court, from which the following language is taken:

"The indictment in this case charges a private stealing from the person of the alleged injured person without his knowledge. Now, I charge you that if you believe from the evidence, beyond a reasonable doubt, that the defendant, Odell Allen, in the county of Stephens and State of Texas, on or about the time charged in the indictment, did fraudulently and privately take from the person and possession of the said Ollie Kiser, without his knowledge or consent, the personal property described in the indictment, with the intent to deprive the owner of the value of the same and to appropriate it to the use and benefit of him, the said defendant, then you will find the defendant guilty as charged, and assess his punishment at confinement in the State penitentiary for a term not less than two years, nor more than seven years.

"If you do not so believe beyond a reasonable doubt, you will acquit the defendant and say by your verdict, 'not guilty.' "

From the charge we quote further:

"By 'fraudulent taking' is meant, first, that the person taking knew at the time of the taking that the property was not his own; second, that the property was taken without the consent of the owner; and third, that the property was taken with the intent to deprive the owner of the value of the same and to appropriate it to the use or benefit of the person taking."

The following Special Charge No. 2 was requested by the appellant and refused by the court:

"You are charged that if Ollie Kiser, the prosecuting witness in this case, knew when the defendant, if he did, put his hand into his pocket and permitted the defendant to take his money; or, if you have a reasonable doubt as to the same, it will be your duty to find the defendant not guilty."

In refusing to give the special charge, the trial judge did not believe that the evidence justified an instruction to the jury to the effect that the injured party consciously suffered or knowingly permitted the appellant to take his money. In that view we are constrained to concur with the conclusion of the trial judge. It is thought that the evidence repels the conclusion that the injured party consciously suffered his money to be taken. The condition of the injured party, coming from both the direct and cross-examinations, makes evident that he was not in a mental condition to consent nor in a physical condition to acquiesce in the taking of his money. The expert evidence of the doctor, the evidence of the injured party, and the evidence of the appellant all point to the helpless condition of Kiser; at least a condition which warranted the jury in reaching no conclusion other than that at the time in question Kiser

was helpless; and the evidence presenting an issue of fact touching his consent is, in the opinion of the writer, not apparent from the record.

The judgment is affirmed.

*Affirmed.*